[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 10, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12296

_____

D. C. Docket No. 07-60175-CR-WPD

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

versus

ROGER DEMAREST,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 10, 2009)

Before MARCUS and PRYOR, Circuit Judges, and SCHLESINGER,* District
Judge.

_____

*Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

PRYOR, Circuit Judge:

This appeal presents four issues about a conviction and sentence for money laundering. After he sold a sailboat to two undercover law enforcement officers who posed as narcotics traffickers, Roger Demarest was convicted of one count of money laundering and acquitted of two other counts of the same offense. Demarest argues that he was intoxicated and entrapped; prosecutorial misconduct entitles him to a new trial; the district court delivered a coercive <u>Allen</u> charge; and the district court erred when it calculated his sentence. These arguments fail. When we review the evidence in the light most favorable to the government, the record establishes that Demarest was a persistent and lucid salesman who was eager to close the boat deal even though he knew that the agents' purchase money was illegal drug proceeds. Demarest failed to prove that any statements by the prosecutor prejudiced him; the <u>Allen</u> charge was the pattern jury instruction, which we have upheld as not being coercive; and the district court correctly applied the Sentencing Guidelines. We affirm.

## I. BACKGROUND

In June 2007, Demarest, a yacht broker in south Florida, was indicted on three counts of money laundering that occurred during a sting operation in which two undercover law enforcement officers posed as narcotics traffickers. The sting

2

operation commenced in 2005 and originally targeted William Pepper Rodda, another yacht broker. Bruce Coleman, a federal revenue agent, posed as a money launderer and financier for a drug smuggler, and Doug Peters, a Sarasota police officer, posed as the boat captain for the drug smuggler. Coleman first met Rodda in April 2005, and the pair met again, with Peters, in November 2005. Hurricane Katrina and Coleman's work on unrelated cases caused the delay between the meetings. Because the agents asked to purchase a boat with cash and without completing any paperwork, Rodda would not sell them a boat.

Rodda recommended that the agents contact Demarest, a friend of his, who was the listed broker for a fifty-foot sailboat that might meet their needs. Although the agents had not previously heard of Demarest, they followed Rodda's recommendation. The agents first met with Demarest in November 2005.

Demarest asked the agents where they planned to sail, and they told him South America. The agents asked Demarest about the fuel capacity and radar equipment of the boat, and Demarest became aware that they planned to use the boat for an illicit purpose. Demarest offered to help the agents acquire the radar equipment they needed.

When the three men began to discuss the purchase of the boat, the agents stated that their boss would buy the boat only with cash. Although Demarest said

he "d[id]n't like cash[,]" he agreed to accept cash if the agents would pay in increments smaller than $10,000 to avoid "the IRS com[ing] down on [his] case." Coleman told Demarest that their boss's name could not appear on the contract, and Demarest advised the agents to form a Delaware corporation to purchase the boat. The agents also inquired about the likelihood that the Coast Guard would board the boat, and Demarest explained that the Coast Guard ordinarily boarded powerboats, not sailboats.

Demarest's awareness of the illicit nature of the agents' business increased as the meeting continued. The agents explained that they could not enter a contract that day because their boss "can't come in[to] the country right now." Demarest asked whether the boss was "a bad boy," and the agents responded that "one of his employees got popped and kind of rolled over on him" and that "[d]opers are dopey and people are dopey." Demarest told the agents that he "thought [he] was smelling a little . . . whiff of that." When Peters stated that he liked the boat because it could haul a lot of "cargo," Demarest responded that he "didn't hear that[,]" and Coleman stated that Peters "didn't say 'drugs,' he said 'cargo.'" Peters stated that he had been "hauling dope on catamarans and . . . [couldn't] get enough on them to make." Demarest again stated that the boat was fast, and he told the agents about his own experience smuggling marijuana. Peters stated that "cocaine

4

is the thing here" and that he was interested in all of the spaces on the boat where he could "put some kilos," which were worth "eighteen thou" per kilo. Demarest expressed interest in being a member of Peters's crew, continued to boast about his experience running drugs, and stated that he had never been stopped by the Coast Guard, perhaps because he used women and children on board as distractions.

Coleman told Demarest that Rodda "was scared" of the agents, and Demarest responded that Rodda had previously served time related to drug charges and did not want to lose his brokerage license. Demarest also told the agents that his "old lady snagged some of [Rodda's] dope on [their] last run." Demarest told the agents that he would not tell Rodda that the agents were drug smugglers but would share his commission with Rodda. Demarest stated that he could distinguish federal agents from real drug runners by the kind of car agents drive and that he was "in the same camp" as they were. After the agents exchanged contact information with Demarest, they left and called Rodda to ask whether he wanted to participate in the transaction. Rodda declined, and the Internal Revenue Service terminated its investigation of him.

On November 11, 2005, Coleman called Demarest to say that his boss had approved the boat purchase. The deal was postponed until later that month because of Hurricane Wilma. On November 21, 2005, Coleman met Demarest at the yacht

5

sales company that Demarest owned, Parrot & Herst Yacht Sales, with $18,000 in cash as a down payment. Coleman stated that his boss would pay the asking price for the boat, $179,000. Demarest suggested that Coleman call the Delaware corporation that would purchase the boat "Sand and Sea Charters[,]" and he referred Coleman to a documentation company to establish the corporation. Demarest explained that he ordinarily "just made up a name" for the individual who formed the company.

During the same meeting, Demarest told Coleman that he had been "drunk as a hoot" when he first showed the agents the boat and had "said more than [he] ever wanted to say." Demarest said he could not be a member of a smuggling crew because he was "too old." Coleman asked Demarest whether he had told the owner of the boat that the purchasers were "in the dope business[,]" and Demarest said he had not. Demarest expressed concern that Coleman was "in the federal business" but proceeded with the arrangements for the deal. Demarest and Coleman agreed that "it was imperative that neither of their names appear on a wire transfer to the bank of funds in excess of $9,999[,]" and Demarest told Coleman to supply a name and identification, "phony or not[,]" for the corporate documents. Demarest and Coleman counted the $18,000, and Demarest told Coleman that he would probably keep only $1,000 of his commission after paying debts. After the men counted the

6

money, Demarest provided Coleman the documents to establish the corporation and told him how to "fudge this up."

Eight days later, Coleman and Demarest spoke by telephone. Because Coleman had not yet received approval for the cash he needed to complete the transaction, he told Demarest that he needed to delay the deal because he had been injured in a car accident. Over the next several days, Demarest left numerous voice-mail messages for Coleman and suggested that he had another buyer for the boat if Coleman was unable to complete the purchase. Demarest also told Coleman that he would travel to Coleman's bank in Hilton Head, South Carolina, if that was necessary to close the deal.

On December 7, Coleman and Demarest again spoke by telephone. Demarest told Coleman that he "really want[ed] to make this thing happen" because he was "in the weeds" from having lost half his inventory in Hurricanes Katrina and Wilma. Demarest described "Sand and Sea Charters" as a "cartoon name" for the putative purchaser of the boat, and he and Coleman agreed to provide a "Mickey Mouse" social security number for the corporate documents. In a different conversation later that day, Demarest confirmed that the owner of the boat would accept cash at the closing.

On December 13, Coleman and Demarest met at Parrot & Herst, and

Coleman paid Demarest $8,000 in cash. Demarest told Coleman that he would find out what Coast Guard documents would be required at the closing and whether a "Mickey Mouse" signature would work or a "real body" would be necessary. Coleman and Demarest agreed to tell the documentation service that the purchaser did not want to be present at closing.

On December 16, Coleman and Demarest spoke by telephone, and Coleman provided Demarest the name, address, and social security number of the putative president of Sand and Sea Charters. The information belonged to Michael Pratt, another federal agent. Coleman and Demarest arranged to meet the owner of the boat before closing to pay the balance due on the boat, $155,000. Demarest again told Coleman that the owner had no idea as to the true source of the money. Three days later, Coleman and Demarest again spoke by telephone, and Demarest told Coleman that Pratt's signature would be required at the closing. Coleman told Demarest that Pratt was an old school friend and that Coleman would forge the signature.

Demarest proposed that he and Coleman meet the owner of the boat aboard the boat to count the cash because he did not "want anybody in the office to see what's going on." Coleman asked whether Demarest would want to participate in a smuggling trip, and Demarest said that he would "love to" but could not because

8

of his age.  Coleman also asked Demarest about Rodda, and Demarest responded that Rodda did not know anything and was cut out "completely . . . because he'd figure out this whole thing in a heartbeat."

Coleman and Demarest met for the last time on December 21, 2005.  After they counted the money with the owner on the boat, the three men drove separately to the office where the closing occurred.  Coleman represented to the closing agent that Pratt had previously signed the documents, and Demarest told her that he would not be processing the documents through Parrot & Herst because he did the deal "as a favor."  After the closing concluded, Coleman paid Demarest a dockage fee for the boat, and Demarest agreed to watch for other boats that Coleman's boss could use to "outrun the cops[.]"  Demarest asked whether Coleman did "one-time runs" or "multiples."

On January 9, 2005, Coleman and Demarest spoke over the phone. Demarest told Coleman that the Coast Guard had rejected the social security number of the president of the corporation that purchased the boat and that Coleman needed to provide a "good" number that matched Pratt's name.  When Coleman called Demarest with a number, Demarest told Coleman that he had located a gold-plated yacht that would be perfect for Coleman.

In June 2007, Demarest was indicted for three counts of money laundering.

The first two counts charged that Demarest laundered funds, 18 U.S.C. §

1956(a)(3)(A),(B), when he accepted the down payment of $18,000 on November

21, 2005, and the balance payment of $155,000 on December 21, 2005. The third

count charged that Demarest laundered funds, id. § 1956(a)(3)(A)–(C), when he

accepted the payment of $8,000 on December 13, 2005. Demarest was arrested in

July 2007. After he watched clips from the videotapes of his meetings with

Coleman, Demarest stated that he was obviously guilty. In his post-arrest

statement, Demarest stated that he was not under the influence of alcohol at that

time.

Demarest raised two defenses at trial: intoxication and entrapment. His

voluntary intoxication defense was that he had an alcohol dependency that was

exacerbated by business difficulties following Hurricane Wilma and that his

drunkenness precluded the formation of the specific intent necessary to launder

money. At trial, a friend of Demarest's and Demarest's wife both testified that

Demarest is an alcoholic. Neither the friend nor the wife had ever seen Demarest

conduct a business transaction or seen Demarest on the dates of the crimes with

which he was charged. Demarest's wife also testified that Demarest's alcoholism

was particularly bad after Hurricane Wilma, when he lost much of his inventory.

Demarest testified on his own behalf. He stated that he drank every day in

2005. Demarest testified that when Coleman approached him about the purchase of the sailboat, Demarest had no money and debts to pay. Demarest stated that he was very drunk during his first and last meetings with Coleman and that his statements to the agents about previous experiences in drug trafficking were lies. Demarest admitted to participating in one drug run with Rodda in the early 1980s but stated that he did not know that he was participating in a drug run when the trip began. Demarest stated that he was desperate to sell the boat because he needed his commission to pay his bills and support his mother. Demarest also testified that he fabricated the story about the other buyer of the boat as a sales tactic. Finally, Demarest admitted that he advised Coleman to use a phony identification to complete the transaction, knew that the agents' purchasing funds could be drug proceeds, and proposed another deal to Coleman after the closing on the sailboat.

During her cross-examination of Demarest and closing argument, the prosecutor made four statements to which Demarest's objections were sustained. Demarest first objected when the prosecutor asked him during cross-examination about financial records to support his allegation that he was desperate. Demarest then objected three times during the closing argument by the prosecutor. Demarest objected to the following argument about entrapment:

> [I]f this case represents to you entrapment, then we would never ever have a case where entrapment wouldn't be a defense. If this case

11

shows inducement, undue pressure by these agents, this case, let's just throw away the money laundering statute sting and just go home because that's ridiculous. It's ridiculous to suggest it and its insulting.

He also objected to burden-shifting when the prosecutor argued, "I mean him saying, 'I used all the money to pay off bills[,]' where is the evidence of that? Where is evidence of that in this case?" Demarest also objected to the following argument about intoxication:

> If intoxication is a defense here . . . then I guess anytime a crime is committed someone can just say, well, I was intoxicated, so don't hold me responsible. I robbed the bank, but I was drunk. I drove home drunk, but I was drunk, so you can't arrest me. I was intoxicated.

Demarest moved for a mistrial based on these arguments, and the district court denied his motion.

The jury began deliberating at 10:20 a.m. on November 20, 2007. At 9:50 a.m. the next day, the jury submitted a note asking whether it could "ask for mercy if we decide on a guilty verdict." At the request of Demarest's counsel, the district court referred the jury back to the original instructions. At 10:20 a.m., the jury stated that it was at an impasse and the district court delivered the pattern Allen charge. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 7 (2003). Demarest's lawyer stated, "Judge Cooke asked me why I always object to 'an Allen charge,' and I said I don't know. It's what I have

12

always done.  So obviously I will object and ask for a mistrial."  Later that day, the jury returned its verdict.  Demarest was convicted on the second count and acquitted of the first and third counts.

The presentence investigation report recommended a range of 63 to 78 months of imprisonment.  The report included a two-level enhancement because Demarest was convicted of money laundering under section 1956, United States Sentencing Guidelines § 2S1.1(b)(2)(B) (Nov. 2008), and a six-level enhancement because Demarest knew or believed the laundered funds were the proceeds of, or intended to promote the distribution of, controlled substances, id. § 2S1.1(b)(1)(A).  Demarest challenged the enhancements and requested a downward variance.  The district court overruled Demarest's objections.

At sentencing, Demarest presented more testimony about his alcoholism, testimony about other health problems, and an apology.  After consideration of the statutory factors for sentencing, 18 U.S.C. § 3553(a), the district court granted Demarest's request for a downward variance from the guideline range and imposed a sentence of 48 months of imprisonment with three years of supervised release.

## II.  STANDARDS OF REVIEW

"We review sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and

13

credibility choices in favor of the jury's verdict." United States v. Trujillo, 146 F.3d 838, 845 (11th Cir. 1998). "The relevant question in reviewing a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted). "We review the district court's refusal to grant a mistrial for abuse of discretion." Id. "Our review of a district court's decision to give an Allen charge is limited to evaluating the coercive impact of the charge." Id. at 846. "We review the district court's application of the sentencing guidelines de novo and its findings of fact for clear error." United States v. Baker, 432 F.3d 1189, 1253 (11th Cir. 2005).

## III. DISCUSSION

Our discussion of this appeal is divided in four parts. We first discuss the issues about the evidence supporting Demarest's conviction; we then discuss Demarest's motions for a mistrial; we next discuss the Allen charge; and we then discuss Demarest's sentence.

*A. The Record Supports Demarest's Conviction for Money Laundering.*

Demarest raises three arguments about the sufficiency of the evidence supporting his conviction for money laundering, but all the arguments fail.

14

Demarest first argues that he proved that he was intoxicated; he next argues that he proved that he was entrapped; and he then argues for the first time on appeal that the evidence underlying his conviction is insufficient under the decisions of the Supreme Court in Cuellar v. United States, ___ U.S. ___, 128 S. Ct. 1994 (2008), and United States v. Santos, ___ U.S. ___, 128 S. Ct. 2020 (2008).  We discuss each argument in turn.

      1.  The Jury Reasonably Rejected Demarest's Intoxication Defense.

Demarest argued that he was so drunk on the day of the closing that he could not form the specific intent necessary to launder money, but the jury reasonably concluded that Demarest was not that impaired by alcohol that day.  Demarest appeared lucid to Coleman as they and the owner of the boat counted and divided the money.  Demarest drove from the dock to the closing separately from Coleman and the owner of the boat.  Demarest did not correct Coleman's lie to the closing agent that Pratt had previously signed the documents and himself lied that he did the deal "as a favor."  Demarest seized the opportunity to develop a customer relationship: he offered to watch for other boats that might suit Coleman's trafficking needs and asked about his tactics for trafficking.  Demarest's cumulative physical and mental efforts on the day of the closing suggest that he was not so drunk that he did not know and intend what was happening.

15

The jury also reasonably rejected Demarest's intoxication defense because Demarest testified in detail about the transaction. We long ago said that it is reasonable for a defense lawyer not to pursue a voluntary intoxication defense when the sworn and detailed recollections of the defendant discredit it, Harich v. Dugger, 844 F.2d 1464, 1471 (11th Cir. 1988) (en banc), partially abrogated on other grounds by Romano v. Oklahoma, 512 U.S. 1, 114 S. Ct. 2004 (1994), as recognized in Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997), so it is certainly reasonable for a jury to reject that defense in that circumstance.

2. The Jury Reasonably Rejected Demarest's Entrapment Defense.

Demarest argued that because of his alcoholism and business troubles, he was "easy prey for overbearing Government agents who presented the financial situation . . . that they were well aware he could not refuse," but this defense fails because the evidence overwhelmingly proved that Demarest was predisposed to close the illegal deal. "A successful entrapment defense requires two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant." United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995). The defendant bears the burden of proving inducement, but after the defendant offers proof of inducement, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. Id. Demarest's appeal turns

16

on the predisposition inquiry because the district court instructed the jury that Demarest had proved inducement and the government had to prove beyond a reasonable doubt that he was predisposed to launder money.

In Brown, we articulated "guiding principles" for the fact-intensive inquiry about predisposition and the critical nature of a defendant's testimony:

> Predisposition may be demonstrated simply by a defendant's ready commission of the charged crime. A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so. . . . [T]he fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor.

Id. at 625 (citations omitted).

The evidence overwhelmingly proved Demarest's predisposition. Demarest "read[il]y commi[tted] . . . the charged crime." Id. Demarest pursued the transaction even though he knew from the first meeting that the agents were purchasing the boat with drug proceeds and to run drugs. Demarest took every opportunity to help the agents conceal their purchase: he suggested a corporate form with a fictitious president; he instructed the documentation service at the closing that he did the transaction "as a favor"; and he accepted a cash payment structured so as to avoid detection by the bank. When Demarest thought that the deal might have gone stale, he hounded Coleman with voice mails and fibbed that there was another buyer interested in the boat. Demarest expressed personal

17

interest in participating in the drug runs, and he was so eager to complete the sale that he told Coleman that he would travel out-of-state to close the deal. Indeed, this sale was not enough. Demarest told Coleman that he hoped there would be more and would watch for other boats that might help the group "outrun the cops." Demarest had multiple opportunities to back out of the boat deal before he committed the offense of conviction, which occurred on the day of the closing, the very last day of the transaction. It is hard to imagine a more enthusiastic money launderer.

Demarest also testified on his own behalf, and the jury was entitled to find that he was predisposed to commit the crime based on his demeanor and credibility. The jury was entitled to disbelieve his testimony that his statements about his drug trafficking experience were lies and to credit his earlier statements that he had participated in drug deals with Rodda. Perhaps most importantly, the jury was entitled to believe Demarest's testimony that he was desperate, or predisposed, to close the deal because of dire financial straits.

3. Cuellar and Santos Do Not Support Demarest's Position.

Demarest also argues that the decisions of the Supreme Court in Cuellar and Santos suggest that the evidence is insufficient to support his conviction. Because Demarest raises these arguments for the first time on appeal, we review them only

18

for plain error.  United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993).  Demarest's arguments about Cuellar and Santos fail.

Demarest argues that "the Court held [in Santos] that [']proceeds['] was limited] to 'profits' from a criminal operation, and not just receipts, which is what the agents in the instant case asserted they were obtaining."  He also argues that an analysis of Cuellar leads to the conclusion that if the transaction was not intended to conceal the true nature, ownership, or location of the funds, it is not money laundering.  He contends that "the payment [at closing] was not concealed or structured" and "[t]he sale of the vessel" also was not concealed.

Demarest's argument about Santos fails.  Santos has limited precedential value.  Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule for this case.  See Santos, 128 S. Ct. at 2022–45.  "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"  Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 2923 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).  The narrow holding in Santos, at most, was that the gross receipts of an unlicensed

19

gambling operation were not "proceeds" under section 1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation. The evidence instead established that the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking.

Demarest's argument about Cuellar also fails. Cuellar involved a different statute than the one under which Demarest was convicted. Cuellar considered whether the government may prove a design to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity by proving that a defendant concealed the proceeds during their transportation across the border. See 128 S. Ct. at 2002–06. Although the statute under which Demarest was convicted does not mention a "design to conceal or disguise[,]" one subsection of that statute requires the government to prove "intent . . . to conceal." 18 U.S.C. § 1956(a)(3)(B). Even if Cuellar applies to Demarest's conviction under that subsection, it has no impact on his conviction under clause (A) of subsection (3) for laundering money "with the intent . . . to promote the carrying on of specified unlawful activity." Id. § 1956(a)(3)(A) (emphasis added).

*B.  The District Court Did Not Abuse Its Discretion When It Denied Demarest's Motions for a Mistrial.*

Demarest argues that the district court abused its discretion when it denied his motions for a mistrial based on prosecutorial misconduct, but this argument

20

fails.  In reviewing the claim of prosecutorial misconduct, we assess (1) "whether the challenged statements were improper" and (2), "if so, whether they prejudicially affected the appellants' substantial rights."  United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir. 1990).  Demarest fails to explain how any of the arguments he attacks prejudiced him.

Demarest first argues that the prosecutor impermissibly shifted the burden of proof from the government to him when she asked him during cross-examination about financial records to support his allegation that he was desperate, but we disagree.  The prosecutor was entitled to cross-examine Demarest after he decided to testify, and a cross-examination necessarily entails testing the plausibility of a defendant's account.  See United States v. Garcia-Guizar, 160 F.3d 511, 521–22 (9th Cir. 1998).  Demarest also fails to make any argument about how this question substantially prejudiced him.

The prosecutor also made three improper arguments in closing, but none of the improper arguments were grounds for a mistrial.  Demarest's objections to the prosecutor's improper arguments about entrapment, intoxication, and burden-shifting were all sustained and requests for curative instructions were granted, but Demarest failed to establish that any of these improper arguments substantially prejudiced him.  The jury instead acquitted Demarest on two of three charges.  The

21

district court did not abuse its discretion when it denied Demarest's motion for a mistrial. See Obregon, 893 F.2d at 1310.

### C. The Allen Charge Was Not Coercive.

Demarest argues that the jury wanted to show mercy and the pattern Allen charge "obviously intimidated jurors to reach a compromise, inconsistent verdict[,]" but this argument fails. We have explained that the pattern Allen charge is not coercive because it "specifically requests that 'no juror is expected to give up an honest belief he or she may have as to the weight or effect of the evidence[,]'" Trujillo, 146 F.3d at 846–47 (footnote omitted), and the split verdict at Demarest's trial does not establish that the charge was coercive to these jurors. Viewed in the light of the inquiry by the jury about whether it could show mercy, the acquittals appear motivated by leniency, not intimidation. The Allen charge was not error.

### D. The District Court Did Not Err When It Enhanced Demarest's Sentence.

Demarest's remaining arguments pertain to the enhancement of his sentence. He raises two objections. Both fail.

Demarest first argues that the district court double counted when it enhanced his sentence by two levels because he was convicted under section 1956, but that enhancement does not constitute impermissible double counting. "Impermissible double counting occurs only when one part of the Guidelines is applied to increase

22

a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999) (internal quotation marks omitted). "Double counting a factor during sentencing is permitted if the Sentencing Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing." United States v. Stevenson, 68 F.3d 1292, 1294 (11th Cir. 1995) (per curiam). The two-level enhancement was not impermissible double-counting because Demarest's violation of section 1956 was not factored into his base offense level. The base offense level for money laundering does not distinguish between the various money-laundering statutes, see U.S.S.G. § 2S1.1(a) (covering violations of 18 U.S.C. §§ 1956, 1957, 1960), but the enhancements do, see id. § 2S1.1(b)(2)(A) (applying a one-level enhancement for violation of 18 U.S.C. § 1957); id. § 2S1.1(b)(2)(B) (applying a two-level enhancement for violation of 18 U.S.C. § 1956).

Demarest next argues that the district court erred when it applied a six-level enhancement because he knew or believed that the funds were the proceeds of or intended to promote the distribution of controlled substances, but this argument also fails. Demarest argues that "his activity did not fall within the ambit of this

enhancement, particularly again in light of <u>Santos</u> . . . and <u>Cuellar</u>[,]" but he says nothing about his belief that the agents' purchase money was drug money or that their purpose was to smuggle drugs. Demarest's statements during the meetings about the sale and his testimony at trial proved that he believed the laundered funds were the proceeds of or intended to promote the distribution of illegal drugs.

## IV.  CONCLUSION

Demarest's conviction and sentence are **AFFIRMED**.