[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10331
Non-Argument Calendar

_____

D.C. Docket No. 0:12-cr-60111-WPD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEAN BERNABE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 21, 2013)

Before TJOFLAT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Jean Bernabe appeals his convictions for three counts of making false

statements in connection with the purchase of firearms, in violation of 18 U.S.C.

§ 922(a)(6).  Defendant-Appellant Bernabe was convicted after a jury trial and sentenced to 27 months' imprisonment on each count, running concurrently. Bernabe testified at his trial.  Bernabe raises for the first time on appeal objections to some of the prosecutor's questions of him during cross-examination and some of the prosecutor's closing arguments.  After plain-error review, we affirm Bernabe's convictions and sentences.

## I.  TRIAL EVIDENCE

We begin by setting forth the trial evidence.  A key issue at trial was whether, after purchasing firearms, Bernabe transferred those guns to individuals in Haiti, or whether he kept them himself, either at his home in the United States or at his home in Haiti.

Bernabe was born in Haiti and moved to the United States when he was 25 years old.  He is an American citizen.  After coming to the United States, he lived in Florida, where he worked for the local school district and served as a part-time reservist in the Army.

Bernabe maintains close ties to Haiti.  Most of his family members continue to live there, including his brother, sister, cousin, uncles, and aunts.  Bernabe's wife and children also are there.  In 2009, Bernabe started making frequent trips to Haiti.  Although his primary home is in Florida, at some point, he acquired a house in Haiti.

2

### A.    The Firearms Purchases

Each count in the indictment was based on a 2011 gun purchase.  On March 4, 2011, Bernabe purchased from the Peoples Pawn & Jewelry in Lauderdale Lakes, Florida, a .40 caliber Taurus pistol (count one).  On June 8, 2011, Bernabe purchased a .40 caliber Beretta "Px Storm" pistol from the Arizona Shooting Range Guns and Knives, also in Lauderdale Lakes, Florida (count two).

One week later, on June 15, 2011, Bernabe returned to the Arizona Shooting Range and purchased three more firearms—a Glock seventeen, nine millimeter semi-automatic pistol; a Glock nineteen semi-automatic pistol; and a Beretta Px4 Storm semi-automatic pistol (count three).

Before completing each purchase, Bernabe filled out a Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473 ("Form 4473"), a federal form used to document the identity of a gun purchaser and to ensure that the individual is eligible to lawfully purchase a firearm.  Form 4473's question 11.a is: "Are you the actual transferee/buyer of the firearm/firearms listed on this form?  **Warning: You are not the actual buyer if you are acquiring the firearms on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearms to you.**"

3

On each Form 4473 that he completed, Bernabe stated that he was the "actual buyer" of the firearm or firearms. Additionally, the back of Form 4473 contains the following:

> I certify that my answers to section A are true, correct, and complete. I have read and understand the notices, instructions, and definitions on ATF Form 4473. I understand that answering 'yes' to Question 11.a, if I am not the actual buyer, is a crime punishable as a felony under federal law . . . .
> . . . .
> I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under federal law . . . .

Bernabe signed beneath these certifications on each Form 4473 that he completed.

At trial, Bernabe did not dispute that he had purchased the five firearms named in the indictment, or that he had signed a federal form after each purchase stating that he was the "actual buyer" of those weapons. The dispute at trial was whether Bernabe's signed statements, made under the possibility of federal prosecution were false. At trial, the government's ATF agent testified that Bernabe admitted to him that he had purchased the guns on behalf of individuals in Haiti and sent the guns to Haiti shortly thereafter. Thus, Bernabe was not the "actual buyer" and his statements were false.

Bernabe's main defense was that he had never confessed to buying the guns for others, that he had bought them for himself, and that he still possessed at least some of the guns at his house in Haiti. For example, during his opening statement,

4

Bernabe's attorney said: "[A]s far as the guns go, . . . he has the guns.  The guns have not been transferred to anyone."

**B.     Government's Witnesses**

Ali Berisha, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") testified for the government.  After the June 2011 purchases, Agent Berisha received a routine notification from the Arizona Shooting Range that Bernabe had purchased more than two handguns in a five-day period.  Upon receiving this notice, Agent Berisha contacted Bernabe and set up a meeting with him.

At that meeting, which occurred on July 7, 2011 Agent Berisha asked Bernabe where the firearms were that he had recently purchased.  Bernabe responded that they were in Haiti.  Bernabe told Agent Berisha that his friends in Haiti "pre-ordered" firearms from Bernabe, after which Bernabe would go to the United States, purchase the firearms, travel back to Haiti, and give the guns to the person who had pre-ordered them.

According to Agent Berisha, Bernabe told him that this was what had happened to the Taurus pistol purchased on March 4, 2011.  Sometime before that date, a friend of Bernabe's in Haiti—identified only as "Rosemont"—had given Bernabe money to purchase the pistol in the United States.  Bernabe did so, buying it with Rosemont's money.  Afterwards, Bernabe flew to Haiti with the pistol

checked in his luggage.  Upon arrival, he gave the gun to Rosemont.  During his investigation, Agent Berisha obtained airline records showing that Bernabe had flown from Miami to Port-au-Prince, Haiti on March 6, 2011 with the Taurus pistol in his checked luggage.

Bernabe had more trouble getting the other four guns (those purchased in June 2011) to Haiti, Agent Berisha testified.  When Bernabe tried to check those guns in his luggage, as he had done before, the airline had not let him do so.  To get the firearms to Haiti, Bernabe had paid his friend—identified first as "McIntosh"—$200 per firearm to ship them there by boat.  A few days after that initial interview, Bernabe told Agent Berisha that "McIntosh" was actually an individual named Giscard Borgard who lived in Tampa, Florida.

Agent Berisha and Bernabe remained in contact for a few weeks after the initial interview, speaking frequently on the telephone.  Shortly after the July 2011 interview, Bernabe left Florida for a month-long period of military training in Wisconsin.  Bernabe even called Agent Berisha to let him know that he would be leaving Florida temporarily.  During each call, Bernabe stuck with his original story—that he had purchased the guns for individuals in Haiti and then transferred them to those Haitian purchasers.

In October 2011, Bernabe contacted Agent Berisha and changed his story. Now, Bernabe claimed that he had kept the guns with him in Florida, and that

before he left for his military service in Wisconsin, he had given the guns to Borgard for safekeeping.  Agent Berisha testified that Bernabe had reported as stolen with local police four guns—two Glock pistols and two Beretta pistols (the guns purchased on June 8 and June 15).  As discussed later, the government's evidence indicated that Bernabe's police report was a sham that he had obtained only after becoming concerned about ATF's investigation of him.

During cross-examination of Agent Berisha, Bernabe's attorney attempted to raise the possibility that Bernabe still possessed the guns.  Bernabe's attorney asked Agent Berisha: "Where are [the guns]?"  Agent Berisha responded that the airline records showed that the Taurus pistol purchased on March 4, 2011 had been taken to Haiti, but that he had no way of knowing if it was still there; as for the other guns, he did not know where they were.  Bernabe's attorney suggested that the Taurus pistol "could be in [Bernabe's] house in Haiti."  He also suggested that Bernabe "could have all of . . . . the guns that he purchased."

The government's evidence also included the testimony of Deputy Ricardo Perez of the Broward County Sheriff's Office, to whom Bernabe reported four guns as missing on September 29, 2011.  Deputy Perez's testimony refuted Bernabe's claims that Borgard had "stolen" the four guns.  For example: (1) Bernabe just reported the weapons as missing and did not state that they had been stolen; and (2) Bernabe did not ask the police for assistance in recovering the guns

7

or encourage the police to investigate their whereabouts. Deputy Perez stated that the report that he prepared based on Bernabe's statements was "an FYI type of thing, for your information report" and that the report had not triggered any police action. Deputy Perez testified that Bernabe had told him that the reason he was filing a police report was because ATF agents had contacted him about the location of the guns and he wanted some report to document that "he didn't know the whereabouts of his firearms."

## C.    Defendant's Testimony and Closing Statements

At trial, Bernabe testified. Bernabe refuted Agent Berisha's testimony. Bernabe testified that he did not sell guns to people in Haiti. According to Bernabe, the Taurus pistol purchased on March 4, 2011 and the Beretta pistol purchased on June 8, 2011 were "in [his] house in Haiti." Bernabe indicated that he had taken them to Haiti to protect himself while there because "Haiti is a very dangerous country." As for the three guns purchased on June 15, 2011, Bernabe testified that those guns were in his Florida home when he received his summons for military duty. For security reasons, Bernabe did not want to leave them there while he was away. Thus, he gave the guns to his friend, Borgard, for safekeeping.

Bernabe's statements about the location of the Beretta named in count two were contradictory. On the one hand, he said that that pistol was "in [his] house in Haiti." On the other, he indicated that he gave this gun to Borgard for safekeeping

8

in Florida.  Specifically, Bernabe testified that he gave four guns to Borgard—two Glock pistols and two Beretta pistols.  Thus, during his testimony, Bernabe appeared to say that the count two Beretta was both in Haiti and somewhere with Borgard.[1]

In any event, when Bernabe returned from his military service, he could not find Borgard.  After searching exhaustively for him, Bernabe reported the four guns as missing with local police in Florida.

During cross-examination, the government repeatedly asked Bernabe about the locations of the guns.  Although he had previously testified only that he had taken two guns to Haiti—the Taurus pistol purchased on March 4 and the Beretta pistol purchased on June 8—on cross examination, Bernabe testified that "three weapons . . . [were] presently at [his] house in Haiti"—two Taurus pistols and one Beretta pistol.  Bernabe stated that he had offered to bring these guns back to the United States, but that Agent Berisha had advised him that doing so "would be breaking the law of the United States."

The challenged cross-examination questions followed.  In response to Bernabe's statement, the prosecutor asked, "Sir, where are the pictures of the guns?"  When Bernabe gave a non-responsive answer, the prosecutor again asked,

---

[1]Because there is no indication that Bernabe possessed Beretta or Glock pistols other than those named in the indictment, the two Beretta pistols he gave to Borgard were inferentially those named in counts two and three of the indictment.

9

"Where are the pictures of the guns that you currently have in your house in Haiti that would show that you still have them?"  Bernabe again did not directly answer the question.  On appeal, Bernabe now challenges these two questions.  Bernabe's trial attorney never objected to them though.

During closing arguments, the prosecutor returned to the lack of pictures of the guns that Bernabe claimed were at his house.  The prosecutor stated: "[T]he defendant, who testified that he has lots of family in Haiti, could very easily have taken a picture of the guns.  And that didn't happen."  On appeal, Bernabe now challenges this statement, but Bernabe's trial attorney did not object to this closing statement either.

The jury found Bernabe guilty on all three counts.  After calculating Bernabe's guidelines range as 27 to 33 months, the district court imposed concurrent sentences of 27 months' imprisonment on each count.

## II.  DISCUSSION

On appeal, Bernabe contends that the prosecutor committed prosecutorial misconduct by asking the above two questions and making argument concerning pictures of the guns, which Bernabe now claims improperly shifted the burden of

proof to him to prove his innocence.  Because of the lack of objections at trial, we review these issues for plain error.[2]

Prosecutorial misconduct requires reversal only when a prosecutor makes statements at trial that (1) are improper, and (2) prejudice the defendant's substantive rights.  United States v. Frank, 599 F.3d 1221, 1237 (11th Cir. 2010).  A defendant's substantive rights "are prejudicially affected when a reasonable probability arises that, but for the [prosecutor's] remarks, the outcome of the trial would have been different."  United States v. Merrill, 513 F.3d 1293, 1307 (11th Cir. 2008) (internal quotation marks omitted).

When a criminal defendant testifies, the prosecutor is entitled to cross-examine the defendant.  United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009).  "[A] cross-examination necessarily entails testing the plausibility of a defendant's account."  Id.  For example, a prosecutor does not commit misconduct simply by asking a testifying defendant whether someone "could corroborate her testimony" when the defendant's testimony contradicted the government's evidence.  See United States v. Schmitz, 634 F.3d 1247, 1267 (11th Cir. 2011).

---

[2]Ordinarily, we review claims of prosecutorial misconduct de novo.  United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011).  However, "[i]f the defendant fails to object to the alleged misconduct below, this Court reviews for plain error."  United States v. Frank, 599 F.3d 1221, 1238 (11th Cir. 2010).  In such cases, the defendant must show: "(1) an error, (2) the error is plain or obvious, and (3) the error affects the defendant's substantial rights."  Id.  This Court has stated in the context of a prosecutorial misconduct claim, "[t]he plain error rule should be used sparingly, and a conviction should be reversed only if a miscarriage of justice would otherwise result."  Id. (internal quotation marks omitted).

However, during cross-examination of the defendant, or during arguments to the jury, the prosecutor "may not make comments that would shift the burden of proof to the defendant." United States v. Bernal-Benitez, 594 F.3d 1303, 1315 (11th Cir. 2010). Burden-shifting comments are those that "suggest that the defendant has an obligation to produce any evidence or to prove innocence." United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992).

A prosecutor's burden-shifting statements require reversal when they are "so pronounced and persistent that [prosecutorial misconduct] permeates the entire atmosphere of the trial." Id. (internal quotation marks omitted). "[P]rejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof." Id. at 1087. Additionally, reversal is not required when "there is sufficient independent evidence of guilt." Merrill, 513 F.3d at 1307 (internal quotation marks omitted).

Bernabe has not met his plain-error burden. We doubt whether any error occurred at all. The government contends that because Bernabe testified and claimed that the government's whole case was fabricated, the government was entitled to ask questions that "tested the plausibility of [his] story." See Schmitz, 634 F.3d at 1267. The government could do so by asking him to corroborate his testimony about the location of the guns. See id. In short, Bernabe opened the door to the government's asking him for corroborating evidence, and the

12

government's questions and arguments simply called into question whether Bernabe's story made sense and was supported by the record evidence.

However, we need not conclude that all of the prosecutor's statements and questions were proper. Even if we assume that some portion of them was erroneous, no such error was plain or affected Bernabe's substantial rights.

First, the district court cured any prejudice during its instructions. The district court told the jury that Bernabe was "presumed . . . to be innocent." The district court further explained that "the law does not require a defendant to prove innocence or to produce any evidence at all. The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty." The district court advised the jury that it was to decide the case based "only [on] the evidence that I have admitted in the case." The jury learned that "[e]vidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and isn't binding."

Because we presume that the jury followed these instructions, the instructions "purge[d] the taint" of any allegedly improper questions or statements the prosecutor may have made. See Simon, 964 F.2d at 1086–89 (holding that "although the prosecutor's remarks were probably improper, the district court rendered any error harmless by the repeated instructions to the jury that the defendant had no burden to produce any evidence"); see also Schmitz, 634 F.3d at

13

1267 ("[E]ven if some of the prosecutor's questions slightly suggested that Schmitz had the burden of proof, the district court cured any possibility of prejudice with its clear and repeated instructions on the prosecution's burden of proof.").

Second, the government produced ample evidence for us to conclude that the outcome of the trial would not have been different without the prosecutor's remarks. The government's evidence included the testimony of Agent Berisha, who had 13 years' experience working for the ATF. Agent Berisha's testimony was corroborated by flight history documents, was consistent, and was plausible. The government's other evidence from Deputy Perez further discredited Bernabe's story and established that Bernabe had obtained a sham police report after he became aware that the ATF was investigating him.

In contrast, Bernabe's testimony was uncorroborated, internally inconsistent, and difficult to follow. By choosing to testify, Bernabe ran "a substantial risk of bolstering the [g]overnment's case." See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). This is because, if the jury did not consider Bernabe's testimony to be credible, it was entitled to conclude the opposite was true. Id. ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt."). In light of the government's evidence, Bernabe on appeal has shown no plain error in his trial.

Accordingly, we affirm Bernabe's convictions and sentences.

**AFFIRMED.**