[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 12, 2010
JOHN LEY
CLERK

No. 09-12191

_____

D.C. Docket No. 07-00349-CR-1-CG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARACELY LOPEZ,
RAMON GARZA, JR., a.k.a. Sonny,
ELDA LOPEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

(November 12, 2010)

Before TJOFLAT, CARNES and COX, Circuit Judges.

PER CURIAM:

This appeal arises out of the prosecution of three defendants for crimes involving the distribution of drugs and money laundering. The Defendants are:

Ramon Garza, Jr., Aracely Lopez, and Elda Lopez.[1]  Garza challenges his convictions.  Aracely and Elda challenge both their convictions and their sentences.  We affirm.

## I.  BACKGROUND

### A.  *The Drug Conspiracy.*

The investigation of a cocaine distribution cell led police to Alvin Knox, a major cocaine distributor in Alabama.  Knox was arrested and, pursuant to a plea agreement, pleaded guilty and agreed to provide assistance to the Government in exchange for the Government's promise to make his cooperation known to the court at sentencing.  Alvin Knox's cooperation ultimately led law enforcement to the Defendants, who had supplied Knox with drugs.

In April 2008, a federal grand jury issued a twenty-three count indictment charging Garza, Aracely, and Elda with various crimes involving the distribution of drugs and money laundering.  Count One charged that, from about January 2001 until about December 31, 2006, the Defendants conspired with each other and with Alvin Knox, his father Benjamin,[2] and others, to possess with intent to distribute approximately 315 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

---

[1] To avoid confusion, we will refer to Aracely and Elda by their first names.

[2] We will refer to Alvin and Benjamin Knox by their first names for the sake of clarity.

2

846. Count Two charged that, from about January 2001 until about December 31, 2006, the Defendants conspired with each other and with Alvin, Benjamin, and others, to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h). Counts Three through Twenty-two charged money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, Garza was charged in Counts Three and Four; Aracely was charged in Counts Three through Nine, Eleven through Eighteen, and Twenty through Twenty-two; and Elda was charged in Counts Ten and Nineteen. Count Twenty-three charged Garza with possessing with intent to distribute approximately 280 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1). The indictment also contained a forfeiture count that is not at issue on this appeal.

The Government presented its case-in-chief by piecing together the conspiracy from the ground up. The Government led off with testimony from three convicted drug distributors who testified that they purchased their drugs–primarily cocaine but also marijuana–from Alvin and Benjamin. The distributors under Alvin who testified included Tony Preston, Derrick Coston, and Kerry Coston. Alvin testified that he also distributed drugs to at least three other distributors: Steven Preston, Gerard Terrell, and Eric White.

3

Tony Preston testified that during one period he was selling ten kilograms of cocaine obtained from Alvin every week. Derrick Coston received a kilogram of powder cocaine from Alvin each week from 1999 to 2003. Kerry Coston testified that he received ten kilograms of cocaine per month from Alvin from 1999 until 2003. Alvin also provided Eric White and Gerard Terrell with ten kilograms of cocaine every month during that period.

Alvin and Benjamin were running two family businesses: their lucrative drug distribution business and a car lot and towing service, known as Premier Auto Sales. Premier Auto was owned by Alvin. By Alvin's own admission, that business served as a front to "cover up" and "legitimize" his drug money. (Dkt.168 at 121.)

Alvin testified at the Defendants' trial. He said that his father, Benjamin, introduced him to the drug distribution business in 1999 and supplied him with drugs. Benjamin, in turn, originally received his drugs from a man named Paul Harris. But Benjamin and Harris parted ways and that is when the Defendants entered the picture.

Alvin testified that he first met Garza and Aracely in late 2000, but that his father had met Garza earlier. Aracely was Garza's wife. Alvin first met Aracely's daughters, including Elda, sometime during 2000 or 2001.

Alvin's initial meeting with Garza and Aracely occurred in a hotel room in a Texas town near the Mexican border. Benjamin was also at that meeting. The next

4

day, Benjamin and Alvin visited Garza and Aracely's residence before traveling with Garza to a trailer. At the trailer, Garza had some money that had been matted together sitting in a pot of water. Benjamin and Garza discussed how to separate the money, and Garza gave the money to Benjamin to see if Benjamin could separate it. Federal agents recovered that money when they executed a search warrant at one of Alvin's two houses in Tuskegee, Alabama, in March 2001.

A business relationship developed out of Benjamin and Alvin's initial meeting with Garza and Aracely. In early 2001, Benjamin began making trips to Texas every few weeks to pick up drugs. Aracely's brother was the source of the cocaine. Benjamin would drive to Texas in different Lincoln Town Cars. Cash would be hidden in secret compartments behind the dash. Garza would tell Benjamin where the delivery would occur, and Benjamin would pick up approximately eight to eleven kilograms of cocaine on every trip. He would return to Alabama with the cocaine hidden in the secret compartments, and Benjamin and Alvin would then distribute the cocaine to their crew for sale.

This distribution arrangement worked well for a time, but it was not without setbacks. On February 20, 2001, Alvin was arrested in the Atlanta airport after authorities discovered approximately $80,000 in cash strapped around his waist and his girlfriend's waist. He was flying to Texas to deliver that money to Benjamin, who

had already driven there. Alvin and Benjamin had planned to give the money to Garza as a payment for drugs. But Alvin's airport arrest was not the biggest setback in the drug distribution scheme; that occurred in 2002.

In 2002, Alvin purchased a Chevy Tahoe from an auto dealer in Montgomery, Alabama, and had it registered in Benjamin's name. At trial, Alvin testified that Garza had installed hidden compartments in the Tahoe. Garza and Aracely then traveled to Alabama to pick up the Tahoe, which they drove to New York. Once the Tahoe arrived in New York, it was to be loaded with fifty or more kilograms of cocaine. The plan was for Garza and Aracely to retrieve the Tahoe after it had been loaded with cocaine and return it to Benjamin. Things did not go as planned.

Former New York City police officer Edgardo Torres testified that on the afternoon of April 4, 2002, he was flagged down by a shop owner who said that someone in the building across the street had a gun. The building across the street was a large garage. Inside the garage, Torres observed three men standing over people on the ground and striking them. When Torres and his partner drew their weapons, the attackers fled. The police cornered and captured one of the attackers before returning to check on the victims, who turned out to be Garza and Aracely. They explained to the police that they were in the garage to pick up a vehicle and that the attackers had intended to rob them. The vehicle was the same Chevy Tahoe that

Alvin had purchased and registered in Benjamin's name. Garza and Aracely said it belonged to a friend.

The police took Garza and Aracely to a hospital. The two were being treated as victims at that point, and the police did not watch them closely. Garza and Aracely took advantage of the situation and skulked away from the hospital. Meanwhile, back at the precinct, the attacker who was arrested explained that he was there to rob Aracely and Garza because there were drugs in the vehicle.

Because the garage was about to close for the evening, the owner moved the Tahoe to a parking garage across the street so that Garza could retrieve it. The police returned to the area near the garage, where they waited for the couple to return to pick up the Tahoe. Garza and Aracely arrived in separate vehicles. Aracely departed unimpeded, but when Garza tried to drive the Tahoe out of the parking garage, the police arrested him. Garza consented to a search of the vehicle, and the search turned up eleven kilograms of cocaine hidden in a secret compartment underneath the rear window. Alvin testified that Garza told him that not all of the cocaine was discovered; some of it remained hidden in the vehicle after the initial police search.

Garza was incarcerated after his arrest, and the Tahoe and drugs were confiscated. After Garza's incarceration, Alvin and Benjamin did business with Aracely directly. Because Aracely had difficulty speaking English, Benjamin and

Alvin communicated with her through her daughters, Elda and Belinda Lopez.[3] Alvin testified that his first conversation with Elda occurred about two to six months after Garza was incarcerated. Alvin spoke to Aracely through Elda over the telephone and in person. On at least one occasion, Elda flew to Mobile, Alabama, to discuss drugs with Alvin. Alvin testified that, based on the nature of the conversations he had with and through Elda, there was no way that Elda did not know that the conversations concerned drug deals.

As a result of the conversations he had with Aracely through Elda, Alvin arranged two cocaine deals. The sales occurred during 2002. The first deal involved 102 kilograms of cocaine, and the second involved 109 kilograms. The cocaine was delivered to Premier Auto in two shipments by an eighteen-wheeler, and it was hidden in the refrigeration unit of the truck. Alvin and Benjamin arranged to pay Aracely for the cocaine at a later date. They successfully paid Aracely $1.2 million in cash for the cocaine, but they ran into trouble attempting to deliver the rest of the payment.

In January 2003, Benjamin was stopped by police while driving a Lincoln Town Car through Refugio, Texas. The officer who stopped him discovered bundles of money wrapped in green cellophane hidden in a secret compartment in the car's

_____

[3] Belinda Lopez, who was also charged in the indictment, remains a fugitive.

dashboard. Law enforcement seized about $340,000. Alvin testified that Benjamin was en route to deliver the money to Aracely when he was stopped. This money was to be payment for the cocaine that Alvin and Benjamin had already received. Aracely's daughters called and had discussions with Alvin about the lost payment.

In 2004, Garza was released from prison. He contacted Benjamin, so Alvin said, "to reestablish the relationship" with the Knoxes. (Dkt.168 at 263.) Garza agreed to sell Benjamin approximately 300 pounds of marijuana. Using an eighteen-wheeler, Garza delivered the marijuana to a property that Benjamin owned in Eutaw, Alabama. Garza returned on a later date to collect payment for the marijuana. During another trip to Alabama, Garza asked Alvin for money to pay off the debt Alvin and Benjamin owed Aracely as a result of Benjamin's run-in with the law in Texas. Alvin gave Garza $300,000 for delivery to Aracely. After Alvin made that payment to Garza, Aracely stopped contacting him about the drug debt.

## B. *Money Laundering*

The Government introduced evidence concerning the Defendants' businesses and financial transactions in an effort to carry its burden of proof on the money laundering counts. The Government's position was that Garza, Aracely, and Elda used banking transactions and sham businesses to disguise their drug distribution income as legitimate wealth.

9

Travis Ward, a construction worker from Arkansas, testified that, in 2003, he became aware that a friend of his, Richard Finch, was selling marijuana. Ward helped Finch hide 400 pounds of marijuana, after which Finch gave Ward money and instructed him to purchase two cashier's checks. Ward testified that the money was drug proceeds. On October 4, 2003, Finch took Ward to two banks. Following Finch's instructions, Ward purchased one cashier's check for $9,000 and another for $3,000. The first check was made out to Jesus Garza, and the second check was made out to Irma Garza.[4] After purchasing the checks, Ward gave them to Finch. The Government traced the cashier's checks and determined that they were each endorsed by the payees and by Aracely and deposited into one of Aracely's bank accounts on October 6, 2003. The next day, Aracely wrote a counter check for $12,000–the sum total of the two cashier's checks–and cashed it. Counts Three and Four charged Garza and Aracely with substantive counts of money laundering based on the purchases of the $3,000 and $9,000 checks. Count Five charged Aracely with money laundering based on the purchase of a $12,000 check.

The Government also introduced the testimony of Special Agent Victor Henken, who works with the criminal investigations unit of the Internal Revenue Service. Henken had conducted an investigation aimed at identifying money

---

[4] It is unclear from the record whether these two people are relatives of Ramon Garza.

10

laundering financial transactions committed by Garza, Aracely, and Elda. Henken discussed various companies with which the Defendants were affiliated from 2000 through 2006. He relied heavily on the Defendants' tax records in conducting his investigation.

Henken testified that in 2000 and 2001, Aracely reported income from a Schedule C business known as Espinos Cap Sales on her individual tax returns. Henken explained that in a Schedule C business, the individual filing the tax return is in business for herself. From 2000 to 2006, Espinos Cap Sales made no filings with the IRS. In 2002 and 2003, Aracely reported income from another Schedule C business, Textiles BISE, that made no filings with the IRS from 2000 to 2006.

Elda reported income from Custom Clay Products in 2003, listing it as a Schedule C business. She also had income from Custom Clay in 2004 and 2005, but for those years the income was reported on a W-2 tax form as wages rather than as Schedule C income. In 2004 and 2005, Aracely reported wage income from Custom Clay. From September 2000 until March 29, 2001, Garza stayed at a halfway house following a term of incarceration. He filed paperwork with the halfway house stating that his employer during that period was Custom Clay Products. Alfredo Saenz, a former friend of Garza, testified that Garza had used Custom Clay's vehicles to transport drugs.

11

Custom Clay filed no corporate income tax returns for any year after 2000, but it did file highway use tax forms from 2001 to 2005, indicating that the business was operating trucks during those years. Agent Henken found it noteworthy that Custom Clay did not file income tax returns despite having trucks on the road, saying, "[Y]ou would think that those trucks would be generating income that would be reported on an income tax return. But I did not find any income tax returns." (Dkt.170 at 588.)

On documents other than tax filings, Aracely claimed that a business called San Francisco Warehouse was her principal employer. That company did not file income tax records between 2000 and 2006. In 2007, Aracely made a Schedule C filing related to San Francisco Warehouse, but that filing provided only gross income. In other words, it did not list any business expenses associated with purchases of inventory. Agent Henken considered the absence of listed business expenses an anomaly, stating that "[n]ormally if you have a warehouse you would buy the goods that go into the warehouse and then sell those goods." (Dkt.170 at 586.) He testified that the lack of records indicating the cost of goods sold made it seem as if the business was just given items to sell. He further observed that none of the Schedule C filings made by the Defendants listed business expenses, and that it appeared that the Defendants were using Schedule C filings to explain instances when they received money that was not listed on a W-2 form as wages.

12

Agent Henken also described the results of a search carried out at the San Francisco Warehouse in Rio Grande City, Texas. He found no accounting software, spreadsheets, or summaries of business income or expenses on a computer seized from the warehouse. While Henken did recover some spiral notebooks and note cards containing what appeared to be accounts receivable related to sales of furniture in 2007 and 2008, he did not find any corresponding totals of accounts receivable as would be expected in a functioning and ongoing business.

Henken said that businesses are often used as fronts to disguise the proceeds of drug trafficking and that a business that would otherwise fail could be kept afloat by an infusion of drug money. He discussed multiple purchases of furniture made by Aracely and Elda from wholesalers between 2004 and 2006, and testified that those purchases were made for sale rather than personal use. Most of the purchases were made by Aracely, with very few purchases made in Elda's name. Also, most of the purchases were accomplished by wire transfer rather than check. Henken testified that he noticed irregular influxes of unexplained cash into San Francisco Warehouse just before large payments, such as furniture purchases, were made. Henken had observed that pattern of activity in other businesses serving as a front for illegal activity.

Agent Henken also testified that "the purchase of furniture, potentially as a cover load, would represent money-laundering transactions." (Dkt.170 at 646.) Alvin testified that, before Garza was arrested in New York, Garza told him that buying furniture by the truckload would be a good way to conceal the transport of drugs and drug proceeds, and that after the drugs were transported, the furniture could be sold. Counts Six, Seven, Nine, Eleven, Sixteen, and Twenty through Twenty-two each charged Aracely with a substantive count of money laundering related to furniture purchases for San Francisco Warehouse.

Finally, Agent Henken described his analysis of the bank records for accounts belonging to Garza, Aracely, Elda, and Belinda. He determined that, from 2000 through 2006, those four individuals deposited $249,842 in cash into their accounts. Henken noted that the total of cash deposits exceeded the combined adjusted gross income of $166,767 that Garza, Aracely, Elda, and Belinda reported during that same period. He also observed that the cash deposits appeared not to be of a regular amount or on a recurring basis, but instead were sporadic. He noted that just after large cash deposits would be made a large check or wire transfer would be issued. According to him, that pattern of activity is indicative of money laundering. (Dkt.170 at 606-07.)

14

Counts Twelve, Thirteen, Fourteen, Fifteen, Seventeen, and Eighteen charged Aracely with money laundering based on cash deposits into her bank accounts. Counts Ten and Nineteen similarly charged Elda. Each of those alleged transactions involved cash in an amount below the $10,000 reporting threshold.

## C. *Conviction and Sentences.*

The jury found the Defendants guilty as charged on all counts. Garza was sentenced to life imprisonment on Count One; 240 months imprisonment on Counts Two, Three, and Four; and 120 months imprisonment on Count Twenty-three. All his sentences run concurrently. The district court sentenced Aracely to 240 months imprisonment on each of Counts One through Nine, Eleven through Eighteen, and Twenty through Twenty-two, all sentences to run concurrently. The district court sentenced Elda to concurrent sentences of 144 months imprisonment for Counts One, Two, Ten and Nineteen.

## II. STANDARD OF REVIEW

The Defendants' insufficiency of the evidence arguments were properly preserved for our review by timely Rule 29 motions for judgment of acquittal. We review the denial of a motion for acquittal de novo. *United States v. Tampas*, 493 F.3d 1291, 1287 (11th Cir. 2007). In reviewing the denial of a motion for acquittal, this court asks whether, after viewing the evidence in the light most favorable to the

15

prosecution, would any rational trier of fact have found all the essential elements of the crime beyond a reasonable doubt. *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006), *cert denied*, 549 U.S. 1230, 127 S. Ct. 1305 (2007). Arguments raised for the first time on appeal are reviewed for plain error. *United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001).

## III. DISCUSSION

### A. *The Record Supports Garza's Count One Drug Distribution Conspiracy Conviction.*

Garza contends that his conviction on Count One must be reversed because the evidence presented at trial demonstrated multiple conspiracies, rather than the single drug conspiracy charged in the indictment. Garza admits that "the evidence supports a conspiracy involving the named Defendants prior to" Garza's April 2002 arrest. (Appellant Garza's Br. at 18.) He argues, however, that his arrest ended that conspiracy, and that prosecution for it is therefore barred by the five-year statute of limitations. *See* 18 U.S.C. § 3282(a). According to Garza, Aracely began a new conspiracy with Alvin and Benjamin after his arrest, and he had nothing to do with that conspiracy.

Because Garza did not raise his material variance argument in the district court, we review only for plain error. *Dennis*, 237 F.3d at 1300. "We will not reverse a

16

conviction 'because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material *and* [2] substantially prejudicial to the defendant.'" *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (quoting *United States v. Alred*, 144 F.3d 1405, 1414 (11th Cir. 1998)). "The question of whether the evidence establishes a single conspiracy is a factfinding for the jury and, even if multiple conspiracies arguably exist, there will be no variance if, viewing the evidence in the light most favorable to the Government, a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy." *United States v. Adams*, 1 F.3d 1566, 1584 (11th Cir. 1993) (citation omitted). Only if there is no evidentiary foundation for the jury's finding of a single conspiracy will we need to determine whether the variance substantially prejudiced the defendant. *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). When determining whether the jury could have found a single conspiracy, we consider: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.* (quoting *United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008)).

We generally "define the common goal element as broadly as possible," *id.*, and we define the word "common" to mean "'similar' or 'substantially the same' rather than 'shared' or 'coordinate.'" *Richardson*, 532 F.3d at 1285 (quoting *United*

17

*States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997)). As Garza admits, there was a common goal: the distribution of drugs to Alvin and Benjamin. *See Calderon*, 127 F.3d at 1327 ("First, a common goal, that of cocaine importation and distribution, existed in this case."); *Adams*, 1 F.3d at 1583–84 (common goal requirement satisfied where defendants shared goal of importing marijuana).

In addition, as Garza concedes, the underlying scheme remained the same throughout the period alleged in the indictment. (Appellant Garza's Br. at 20.) Both before and after his incarceration in 2002, the drugs and the cash payments were hidden in motor vehicles while being transported. Additionally, both before and after Garza's incarceration, Benjamin and Alvin received the drugs for distribution in Alabama. *See Moore*, 525 F.3d at 1043 (finding single underlying scheme where the two defendants achieved common goal in similar manner); *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998) (finding single underlying scheme where the allegedly multiple conspiracies were virtually the same).

There was virtually complete overlap of participants in what Garza argues were two separate drug distribution conspiracies. The only person he claims was in the pre-incarceration conspiracy, but not the post-incarceration conspiracy, is Garza himself. But Garza's arrest and incarceration in 2002 did not end the original conspiracy; "[a] conspiracy is presumed to continue until its objectives have been

18

abandoned or accomplished." *Richardson*, 532 F.3d at 1286 (citation omitted). The objective of the conspiracy in this case—continually supplying Alvin and Benjamin Knox with drugs for distribution in Alabama—was not abandoned or accomplished when Garza was arrested in 2002, but continued thereafter.

Nor did Garza's arrest automatically trigger his withdrawal from the original conspiracy or signal the end of his participation in it. *See United States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir. 1991) ("[N]either arrest nor incarceration automatically triggers withdrawal from a conspiracy."); *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987) ("A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal."). Garza attempts to sidestep that principle of law by pointing to testimony that, after he was released from prison in 2004, he told a friend that he had ended his relationship with Aracely because she "had been working with his connection . . . in Alabama." (Dkt.169 at 478.) However, other testimony indicated that Garza's incarceration did not end his involvement in the conspiracy. For instance, Alvin testified that, after Garza was released from prison, Garza asked him about a debt that Alvin and Benjamin owed Aracely for drugs. And, Garza collected money to pay that debt. Alvin also said that Aracely stopped contacting him about that debt after he paid Garza.

19

In light of the evidence demonstrating a common plan, a consistent underlying scheme, and overlapping participants, a reasonable jury could find the existence of a single conspiracy beyond a reasonable doubt. *Richardson*, 532 F.3d at 1284. Furthermore, in light of the testimony at trial, a jury could reasonably find that Garza continued to participate in the conspiracy following his release from prison in 2004. Garza's challenge to his conviction on Count One fails.

**B. *The Record Supports Aracely and Elda's Count One Drug Distribution Conspiracy Convictions*.**

Aracely and Elda contend that the evidence is insufficient to sustain their convictions on Count One for conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846. In evaluating sufficiency of the evidence, we assume that the jury made all credibility choices in favor of the verdict. *United States v. Valencia-Trujillo*, 573 F.3d 1171, 1185 (11th Cir. 2009). Furthermore, "'we must determine whether the evidence, construed in the light most favorable to the government, would permit the trier of fact to find the defendant guilty beyond a reasonable doubt.'" *United States v. Brown*, 415 F.3d 1257, 1270 (11th Cir. 2005) (quoting *United States v. Burstyn*, 878 F.2d 1322, 1324 (11th Cir. 1989). "It is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably

could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) (citation omitted).

"To sustain a conviction for conspiracy to possess cocaine with intent to distribute, the government must prove beyond a reasonable doubt that (1) an illegal agreement existed; (2) the defendant knew of it; and (3) the defendant, with knowledge, voluntarily joined it." *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001). "An agreement may be proved by either direct or circumstantial evidence and a common scheme or plan may be inferred from the conduct of the participants or from other circumstances." *United States v. Diaz*, 190 F.3d 1247, 1254 (11th Cir. 1999). The government need not prove "that a defendant knew every detail or that he participated in every stage of the conspiracy." *Id.* Instead, the government need only prove "that the defendant knew the essential nature of the conspiracy." *United States v. Miranda,* 425 F.3d 953, 959 (11th Cir. 2005) (quotation marks and citation omitted).

Aracely contends that the Government failed to prove that she conspired to possess with intent to distribute approximately 315 kilograms of cocaine. She argues that Alvin's testimony was not worthy of belief because he was seeking a reduced sentence. That argument is meritless. We will not review credibility determinations made by the jury unless the testimony is "incredible as a matter of law," *United States*

21

*v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999), and testimony is incredible as a matter of law only when it is "unbelievable on its face." *Calderon*, 127 F.3d at 1325 (quotation marks and citation omitted). The fact that a witness engaged in criminal activities, consistently lied in the past, and thought that his testimony would benefit him does not make his testimony incredible as a matter of law. *Id.* (citation omitted).

Aracely also argues that Alvin's testimony, even if believed, establishes at most that her role in the conspiracy extended to only 211 kilograms of cocaine, rather than the approximately 315 kilograms charged in the indictment. In support of that argument, Aracely claims that the evidence presented by the Government was insufficient to establish that she was aware of or involved in Garza's drug dealings before his arrest or that she was aware that cocaine was in the Tahoe that she and Garza attempted to retrieve in April 2002.

We find these arguments unconvincing. First, the government is not required to prove that the defendant knew all of the details of the conspiracy or participated in each aspect of the conspiracy, but instead need only prove that the defendant knew the essential objective and general scope of the conspiracy. *United States v. McNair*, 605 F.3d 1152, 1196 (11th Cir. 2010); *United States v. Anderson,* 326 F.3d 1319, 1329 (11th Cir. 2003). The Government presented evidence that Aracely personally took the lead in arranging two major cocaine sales, involving a total of 211 kilograms

22

of cocaine, to Alvin and Benjamin. That evidence is more than sufficient to demonstrate that she knew the general nature and scope of the conspiracy: supplying Alvin and Benjamin with large quantities of cocaine for distribution.

Second, Aracely's argument that the evidence is insufficient to demonstrate her awareness of Garza's drug dealings before Garza's arrest fails because a defendant's knowing participation in a conspiracy may be proved through circumstantial evidence. *See McDowell*, 250 F.3d at 1365 (upholding conspiracy conviction based on circumstantial evidence). Aracely was married to Garza up until at least the time of his arrest in 2002. She also attended the initial meeting with Garza, Benjamin, and Alvin, after which Alvin and Benjamin began receiving approximately 11 kilograms of cocaine every few weeks from Garza, which lasted for about a year. A witness at trial testified that Aracely's brother was the source of cocaine that was sold to Alvin and Benjamin. In addition, Aracely accompanied Garza on repeated flights to Alabama and New York during the period charged in the indictment. Some of those flights occurred during the month before Garza was arrested in New York. On one of the trips to Alabama, Aracely and Garza picked up the Tahoe that was to be taken to New York and loaded with cocaine. While "[t]he inference of participation from presence and association with conspirators alone does not suffice to convict[,] . . .

such an inference is permissible in evaluating the totality of the circumstances." *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994) (citations omitted).

Not only did Aracely associate with the conspirators, but she also accompanied Garza to the garage in New York, where the two attempted to retrieve the Tahoe that Alvin testified was supposed to be loaded with fifty or more kilograms of cocaine. It is unlikely that conspirators attempting to transport such a large quantity of drugs would tolerate the presence of a mere bystander during such an important stage of the crime. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1374 (11th Cir. 1994) (finding sufficient evidence to support conviction where it was "highly unlikely" that conspirators smuggling drugs would have allowed the presence of a bystander during smuggling operations). It is also worth noting that, after Garza and Aracely were taken by police to a hospital following the attack in New York, they slipped away, only to return to the garage and attempt to retrieve the cocaine-laden Tahoe. Flight may be considered evidence of guilt. *See United States v. Williams,* 541 F.3d 1087, 1089 (11th Cir. 2008). And all of this occurred before Garza was arrested, at which point Aracely quickly and seamlessly took the helm, arranging two massive cocaine deals with Alvin and Benjamin. A jury could reasonably infer from Aracely's smooth and rapid transition into a leadership role that she already had an intimate understanding of and practical familiarity with the details of the conspiracy. The

24

evidence was more than sufficient to allow a reasonable factfinder to determine that Aracely was aware of, and participated in, the conspiracy to possess with intent to distribute approximately 315 kilograms of cocaine as charged in the indictment.

Finally, even if, as Aracely claims, the Government established her personal involvement only as to 211 kilograms of cocaine, that fact would not require reversal of her conviction. Aracely was convicted for conspiracy to violate 21 U.S.C. § 841(b)(1)(A), which requires only five or more kilograms of cocaine to trigger the highest statutory penalty. The two deals that Aracely personally directed involved a total of 211 kilograms. Aracely's challenge to her conviction for conspiracy to possess with intent to distribute cocaine fails.

Elda also challenges her conviction on Count One. She contends that the evidence failed to prove that she joined the conspiracy charged in Count One. We conclude that it did.

Alvin Knox testified that Elda served as a translator for her mother during conversations between Aracely and Alvin concerning drug deals and also translated similar conversations between Benjamin and Aracely. Alvin testified that Elda traveled with Aracely to Mobile to translate conversations concerning drugs. Because of the content of those conversations, Alvin said, there was no way Elda would not have known that the conversations concerned drug deals. According to Alvin, two

25

drug transactions were arranged as a result of the conversations that Elda translated, and those transactions involved a total of 211 kilograms of cocaine. The Government also produced telephone records showing multiple calls between three phone numbers subscribed to by Elda and phone numbers associated with Alvin. The evidence considered as a whole was sufficient to allow a reasonable jury to conclude that Elda knowingly and voluntarily joined the conspiracy charged in Count One. *See United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998) (noting that, once a drug conspiracy has been shown to exist, "a defendant can be convicted even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators"); *see also Miranda*, 425 F.3d at 959 (defendant may be convicted if she knew the "essential nature of the conspiracy," even if she did not participate in every stage or know every detail) (quotation marks and citation omitted).

### C. The Record Supports Garza's Count Two Money Laundering Conspiracy Conviction.

In a repeat of his challenge to his conviction on Count One, Garza challenges his conviction on Count Two (conspiracy to launder money) on the ground that the evidence at trial established two money laundering conspiracies, rather than the single conspiracy charged in the indictment. He says the first conspiracy lasted from January 2000 until it was ended by his arrest in April 2002. Garza concedes that the

26

evidence presented at trial would support a conviction for conspiracy to launder money involving the named defendants during that period, but he argues that prosecution for that conspiracy is barred by the five year statute of limitations. *See* 18 U.S.C. § 3282(a). Garza claims that he had nothing to do with the second money laundering conspiracy involving Aracely and her daughters, which he says began after his arrest and lasted until December 2006.

Garza did not raise this issue before the district court, so we review only for plain error. *Dennis*, 237 F.3d at 1300. As we said earlier, "even if multiple conspiracies arguably exist, there will be no variance if, viewing the evidence in the light most favorable to the Government, a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy." *Adams*, 1 F.3d at 1584 (citation omitted). Garza again concedes the existence of a common goal, disguising drug proceeds, and he also acknowledges that the nature of the underlying scheme remained the same throughout the period alleged in the indictment. Garza also admits that there was a substantial overlap of participants, but argues that he had nothing to do with the money laundering that occurred after his arrest. A reasonable jury could have found the existence of a single conspiracy spanning the period charged in the indictment given the Government's evidence, which Garza admits showed a common goal, a consistent underlying scheme, and a substantial overlap in

participants. No material variance existed between the indictment and the evidence presented at trial. *See Anderson*, 326 F.3d at 1328 (11th Cir. 2003) (holding that no material variance existed when a reasonable fact finder could have found the existence of a single conspiracy).

Garza in essence argues that his co-conspirators carried on without him after he was incarcerated. At its core, his argument is apparently either that his incarceration ended the original conspiracy, after which his co-conspirators reunited without him in an attempt to achieve the same goal in the same way, or that the same conspiracy rolled along the whole time but his incarceration resulted in his withdrawal from it. Under either characterization, Garza's argument fails. *See Richardson*, 532 F.3d at 1286 (citation omitted) ("A conspiracy is presumed to continue until its objectives have been abandoned or accomplished."); *Gonzalez*, 940 F.2d at 1427.

Further, Garza's claim that he had nothing to do with Aracely after his incarceration is discredited by Alvin's testimony that Garza collected payment in 2004 on a debt that Alvin owed to Aracely. That testimony, viewed in the light most favorable to the Government, would allow a reasonable jury to determine that Garza's association with Aracely and her criminal activities did not end when he was incarcerated.

**D.** *The Record Supports Aracely and Elda's Count Two*
*Money Laundering Conspiracy Convictions.*

Aracely and Elda contend that the evidence is insufficient to sustain their Count Two convictions for conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h). To establish the offense of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must demonstrate that:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

*United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002) (citation omitted). To convict a defendant of conspiracy to commit concealment money laundering, the government must prove that: (1) an agreement existed between two or more persons to violate the law, in this case 18 U.S.C. § 1956(a)(1)(B)(i); and (2) the defendant, knowing the unlawful plan, voluntarily joined the conspiracy. *See United States v. Johnson*, 440 F.3d 1286, 1294 (11th Cir. 2006) (stating elements necessary for conviction under 18 U.S.C. § 1956(a)(1)(A)(i)). Proof of an overt act is not required for conviction of conspiracy to commit money laundering. *United States v. Hall*, 349 F.3d 1320, 1323-24 (11th Cir. 2003).

In defending the convictions, the Government relies on evidence that the Defendants worked together to create phony businesses to hide the proceeds of their drug trafficking. Aracely and Elda argue that the Government failed to offer sufficient evidence that the businesses' transactions involved proceeds of drug trafficking. We disagree.

Proof that the funds underlying a conviction for conspiracy to commit money laundering were drug proceeds may be established by circumstantial evidence. *United States v. Frazier*, 605 F.3d 1271, 1282 (11th Cir. 2010). Furthermore, "[t]he government need not prove that the funds came from a specific illegal action." *Id.*

The evidence at trial established that the Defendants received large amounts of cash in payment for the cocaine that they provided Alvin and Benjamin. The evidence further established that Custom Clay Products, a business associated with the Defendants, did not file income tax returns between 2000 and 2006, despite filing highway use tax forms indicating that it had trucks on the road during that period. Agent Henken, who specializes in money laundering investigations, testified that he would have expected to see tax filings indicating the revenue generated by the business's activities.

San Francisco Warehouse, another business associated with the Defendants, did not file any tax returns from 2000 through 2006. A 2007 Schedule C filing for

30

San Francisco Warehouse listed gross income for the business, but did not list any business expenses indicating that it had purchased inventory to sell. Agent Henken testified that the lack of any records of the cost of goods sold made it seem as if San Francisco Warehouse was just given things to sell. Henken also testified that he did not find totals of accounts receivable or other accounting records that would be expected in a functioning business.

Agent Henken noted irregular influxes of unexplained cash into San Francisco Warehouse just before the company made large payments, such as payments for the furniture purchases, that were the basis of some of the substantive money laundering counts. According to Henken, that pattern of activity was consistent with what he had observed in investigating other businesses that were fronts for illegal activity. Henken's testimony, viewed in the light most favorable to the Government, was sufficient to allow a reasonable jury to conclude, as this jury did conclude, that the businesses' transactions involved proceeds of the Defendants' drug distribution. *Brown*, 415 F.3d at 1270. *Cf. United States v. Johnson,* 440 F.3d 1286, 1291 (11th Cir. 2006) (listing "highly irregular features of the transaction" and "expert testimony on practices of criminals" among types of evidence that may be considered in determining if other elements of money laundering have been met) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476 (10th Cir. 1994)).

31

Aracely and Elda also contend that their money laundering conspiracy convictions must be set aside because the Government failed to prove that they conspired to launder the "profits," as opposed to the "gross receipts," of an unlawful activity as required by *United States v. Santos*, 553 U.S. 507, 128 S. Ct. 2020 (2008). Because Aracely and Elda did not raise this argument before the district court, our review is only for plain error. *Dennis*, 237 F.3d at 1300.

Aracely and Elda's reliance on *Santos* is misplaced. In *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 421 (2009), we explained that *Santos* has limited precedential value, limited to a holding that the gross receipts of an unlicensed gambling operation were not "proceeds" under section 1956. *Id.* Like the defendant in *Demarest*, Aracely and Elda were accused of laundering and conspiring to launder the proceeds of illegal drug trafficking. Thus, *Santos* is not controlling, and the Government was not required to show that they laundered the profits of a criminal operation. *See Demarest*, 570 F.3d at 1242. Consequently, there was no error, much less plain error.

### E. *The Substantive Money Laundering Counts.*

Garza argues that the evidence was insufficient to sustain his convictions on Counts Three and Four (the purchase of the cashier's checks by Ward with drug money) because he was not personally involved in the purchase of either the $9,000

or the $3,000 cashier's check. Garza's argument falls short because co-conspirator liability laid out in *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180 (1946), supports his conviction. Under *Pinkerton*, "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof," so long as "the substantive crime was a reasonably foreseeable consequence of the conspiracy." *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) (quotation marks and citation omitted). Garza's counsel conceded at trial that a *Pinkerton* instruction was appropriate and one was given, limited solely to Garza.

Our review of the record persuades us that the evidence was sufficient to sustain Garza's substantive money laundering convictions. *See United States v. Tokars*, 95 F.3d 1520, 1539 (11th Cir. 1996).

Aracely challenges her convictions on Counts Six, Seven, Nine, Eleven, Sixteen, and Twenty through Twenty-two, arguing that the Government failed to prove that those transactions involved the proceeds of drug trafficking. Each of those counts involved a purchase of furniture by San Francisco Warehouse. As we have already explained, the evidence presented would allow a reasonable jury to determine that San Francisco Warehouse was not a functioning, legitimate business, but instead

served as a front to disguise drug distribution proceeds. In fact, Agent Henken specifically testified to his opinion that the furniture purchases were money laundering transactions, and he based that in part on the unexplained, irregular influxes of cash into San Francisco Warehouse, which did not appear to be a legitimately functioning business, just before major furniture purchases. That evidence was sufficient to allow a reasonable jury to conclude that those transactions involved the proceeds of drug trafficking.

Aracely also challenges the sufficiency of the evidence supporting her convictions on Counts Eight, Twelve through Fifteen, Seventeen, and Eighteen. Each of those counts charged her with substantive money laundering based on cash deposits made between 2000 and 2006 to one of the six bank accounts held in her name. Once again, Aracely argues that the Government failed to show that those transactions involved the proceeds of drug distribution. Again, we disagree.

The Government presented evidence that Aracely was involved in drug distribution and that she received large amounts of cash in exchange for the drugs she sold. Agent Henken analyzed the Defendants' bank records and testified that Aracely had six accounts in her name between 2000 and 2006, into which she made sporadic cash deposits in non-recurring amounts. Henken testified that those large cash

deposits were followed by large checks or wire transfers out of the account, a pattern indicative of money laundering.

The Government also offered evidence that during every year between 2001 and 2006, Aracely made deposits far in excess of her reported adjusted gross income for that year. In fact, between 2000 and 2006, she made cash deposits totaling $216,626 into her bank accounts, while reporting only $83,243 in adjusted gross income. Given Aracely's involvement in drug trafficking, the fact that her cash deposits far exceeded her legitimate income, and the unusual pattern of banking activity, a reasonable jury could conclude that the cash deposits at issue in Counts Eight, Twelve through Fifteen, Seventeen, and Eighteen involved proceeds of drug distribution. *See Frazier*, 605 F.3d at 1282 (lack of legitimate income is circumstantial evidence that funds involved in transaction were drug proceeds); *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990) (expert testimony on habits of criminals, evidence of defendant's involvement in drug trafficking, and lack of legitimate income are sufficient to sustain jury's determination that transaction involved proceeds from drug trafficking).

Aracely also challenges her money-laundering convictions on Counts Three through Five. Those convictions were based on the two cashier's checks–for $9,000 and $3,000–purchased by Travis Ward in the names of Jesus and Irma Garza and

35

ultimately endorsed by Aracely and deposited into one of her bank accounts. The next day, Aracely wrote a counter check for $12,000, drawn out of that same account, and cashed it. Again, Aracely contends that the Government failed to demonstrate that those transactions involved proceeds of drug distribution. That argument fails because Ward testified that drug proceeds were used to purchase the cashier's checks totaling $12,000.[5] This evidence is sufficient to affirm her conviction on these counts.

Elda argues that the evidence is insufficient to sustain her convictions on Counts Ten and Nineteen. Those two counts charged her with money laundering based on deposits of cash into one of her two bank accounts. Specifically, Count Ten charged that Elda committed concealment money laundering in violation of § 1956(a)(1)(B)(i) by making a $7,700 cash deposit on June 13, 2005. Count Nineteen charged that she committed the same offense by making a cash deposit of $5,000 on August 16, 2006. Elda argues that the evidence is insufficient to demonstrate that the deposits involved the proceeds of illegal activity.

"Proof that . . . funds were drug proceeds may be established by circumstantial evidence." *Frazier*, 605 F.3d at 1282 (citing *Blackman*, 904 F.2d at 1257). The

---

[5]As with her money laundering conspiracy conviction, Aracely challenges her substantive money laundering convictions under *Santos*, 553 U.S. 507, 128 S. Ct. 2020 (2008). These arguments merit no further discussion.

Government presented evidence that Elda was involved in drug distribution and that there were large amounts of cash involved in the sale of those drugs. The Government also introduced into evidence Elda's tax returns, showing that in 2005, Elda reported income in the amount of $9,100 from her work at Custom Clay Products, and that in 2006, she reported an income of $11,050 from Ochun Transportation. The Government presented evidence that Custom Clay's trucks were used to transport drugs. The Government also presented evidence that Elda had made $700 per week while at Ochun, approximately three times the amount she had reported to the IRS. Further, the Government presented evidence that neither of these two businesses filed corporate income tax returns, lending credence to the Government's contention that these businesses were merely fronts for the money laundering scheme. There was no evidence that Elda had a source of income other than these companies in either 2005 or 2006.[6] Given Elda's involvement in drug

[6]On cross-examination, Elda's counsel asked Agent Henken, "if she was taking a vacation with two of her sisters and each one paid $2,500 in cash to her to put in the bank, to write a check to Disney World in Orlando, there's nothing wrong with that, is there?" (Dkt. 170 at 660-61). Henken replied that such a scenario would be legal. (*Id.* at 661). Elda contends that Henken's answer is evidence that the deposit charged in Count Ten was not drug proceeds. Elda also contends that the fact that Elda purchased a car on the day after the Count Nineteen deposit is also evidence that the funds were not drug proceeds. (Appellant Elda's Br. at 29). We disagree. The jury weighed the evidence and determined that the Government's evidence outweighed Elda's alternative theories. We note that given the overwhelming testimony that Elda's family was in the drug smuggling business, it is not hard to reason that any money Elda may have received from her family for a trip to Disney World was drug proceeds. Furthermore, the purchase of a car is a prime example of money laundering and the fact that Elda may have been planning on purchasing a car does is not indicative of the source of the money.

trafficking and the fact that her income was derived from companies associated with her family's money laundering scheme, a reasonable jury could conclude that the cash deposits at issue in Counts Ten and Nineteen involved proceeds of drug distribution. *See id.*

## F. *Sentencing.*

Finally, Aracely and Elda challenge their sentences. We use a two-step process when reviewing sentences, and we review only for an abuse of discretion. *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). "If we find the sentence procedurally sound, the second step is to review the sentence's 'substantive reasonableness' under the totality of the circumstances, including 'the extent of any variance from the Guidelines range.'" *Shaw*, 560 F.3d at 1237 (quoting *Gall*, 552 U.S. at 51, 128 S. Ct. at 597). When deciding upon a sentence, "[t]he district court must evaluate all of the § 3553(a) factors" and consider each convicted person as an

individual and each case as unique. *Shaw*, 560 F.3d at 1237–38. Finally, "[r]eview for reasonableness is deferential." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005). "[W]hen the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." *Id.* Aracely's challenges her 240-month sentence for procedural error. She contends that the district court erred in applying a three-level enhancement after finding that she qualified as a manager or supervisor in a criminal activity that "involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(b) (2008). We review a sentencing court's determination of a defendant's role in the crime only for clear error. *United States v. Jennings*, 599 F.3d 1241, 1253 (11th Cir. 2010).

Ample evidence demonstrated that the criminal activity involved five or more participants, including Aracely, Elda, Belinda, Alvin, and Benjamin. *See United States v. Caraballo*, 595 F.3d 1214, 1232 (11th Cir. 2010) (person being sentenced is counted in number of participants for purposes of § 3B1.1). Furthermore, the evidence established that, at a minimum, Aracely managed or supervised Elda and Belinda, both of whom traveled with her and served as translators for her. *See* U.S.S.G. § 3B1.1, cmt. n.2 (to qualify for enhancement, defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants"). The district court did not clearly err in applying the § 3B1.1(b) enhancement.

Finally, Aracely contends that her 240-month sentence is substantively unreasonable. Aracely argues that she deserved a more lenient sentence because of her lack of criminal history and because she did not get involved with the crime until she fell in with Garza. Given a total offense level of 43 and a criminal history category of I, Aracely's guidelines range was life imprisonment, *see* U.S.S.G. Ch. 5 Pt. A, but the district court determined that was too high. At the same time, however, the court determined that a substantial sentence was called for because of the seriousness of the crimes and the extent of Aracely's involvement. Accordingly, the district court imposed a sentence of 240 months in prison, below the guidelines sentence of life imprisonment. Because that below-guidelines sentence is not outside the range of reasonableness, the district court's sentencing decision was not an abuse of discretion.

Elda challenges her 120-month sentence for reasonableness. Elda does not argue that the district court improperly calculated her guideline range of 292-365 months. At her sentencing, Elda's counsel acknowledged that she was responsible for 109 kilograms of cocaine. (Dkt.181 at 2-3.) Under 21 U.S.C. § 841(b)(1)(A), a person convicted of a crime involving more than five kilograms of cocaine faces a mandatory minimum sentence of ten years imprisonment. The district court determined that the guidelines range was too high given her role in the conspiracy and

sentenced Elda to twenty-four months more than the mandatory minimum sentence. In our view, this is not unreasonable. Because her below-guidelines sentence is not unreasonable, the district court's sentencing decision was not an abuse of discretion.

## IV. CONCLUSION

Ramon Garza Jr.'s convictions and sentences are AFFIRMED. Aracely Lopez's convictions and sentences are AFFIRMED. Elda Lopez's convictions and sentences are AFFIRMED.

AFFIRMED.