[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-13009

_____

D.C. Docket No. 1:09-cr-21010-JEM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEAN RENE DUPERVAL,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 9, 2015)

Before WILLIAM PRYOR and JORDAN, Circuit Judges, and JONES,[*] District
Judge.

WILLIAM PRYOR, Circuit Judge:

This appeal of criminal convictions involving money laundering and foreign

bribery presents issues of exposure of jurors to publicity; the sufficiency of the

_____

[*] Honorable Steve C. Jones, United States District Judge for the Northern District of Georgia,
sitting by designation.

evidence that a telephone company was an "instrumentality" of a foreign government, 15 U.S.C. § 78dd-2(h)(2)(A); whether the administration of a multi-million dollar contract is "routine governmental action," *id.* § 78dd-2(h)(4)(A); whether the government interfered with a witness when it obtained a clarifying declaration from that witness; and four issues about the application of the United States Sentencing Guidelines. Jean Rene Duperval appeals both his convictions of two counts of conspiring to commit money laundering, 18 U.S.C. § 1956(h), and 19 counts of concealment of money laundering, *id.* § 1956(a)(1)(B)(i), and his sentence of imprisonment of 108 months followed by three years of supervised release. Duperval worked as the Director of International Affairs at Telecommunications D'Haiti, a company owned by the government of Haiti. Duperval participated in two schemes in which international companies gave him bribes in exchange for favors from Teleco. Duperval's arguments fail. We affirm.

## I. BACKGROUND

We divide our discussion of the background in two parts. First, we explain the two schemes to provide bribes to Duperval. Second, we explain the charges against Duperval and the relevant portions of Duperval's trial.

*A. The Two Schemes to Provide Bribes to Duperval.*

From June 2003 to April 2004, Duperval was the Assistant Director General and Director of International Affairs for Teleco. In that role, Duperval managed

contracts with foreign telecommunication companies. Duperval participated in two schemes in which companies provided him with payments in exchange for favors from Teleco.

The first scheme involved Terra Telecommunications Corporation and its representatives, Joel Esquenazi and Carlos Rodriguez. Robert Antoine served as the Director of International Affairs at Teleco before Duperval and had an agreement with Terra in which Antoine reduced amounts owed to Teleco and Terra paid Antoine half of the reduction. Shortly after Duperval was named the Director of International Affairs, he began to receive these bribes. Duperval also received $10,000 and a Rolex watch for his assistance in renewing the contract with Terra.

The second scheme involved Cinergy Telecommunications, Inc., and its representatives, Washington Vasconez Cruz, Cecilia Zurita, and Amadeus Richers. While Antoine worked at Teleco, he helped Cinergy enter into an agreement with Teleco, and Cinergy paid Antoine about $150,000 as a reward. After Teleco fired Antoine, Cinergy hired him as a consultant. In August 2003, the agreement between Cinergy and Teleco was about to expire, and Cinergy was concerned that Teleco would not renew the contract. Antoine met with Duperval and offered Duperval 50 percent of his consulting fee if Teleco renewed the contract. Duperval agreed to help but demanded 60 percent. Teleco maintained its contract with

3

Cinergy, and Duperval received two cents for every minute that was added to the contract, for a total of about $150,000.

Duperval had Cinergy and Terra pay the bribes to two companies. Duperval first used Crossover Records, a music company owned by his brother, Lionel Duperval. Cinergy wrote five checks, for a total of $142,460, to Crossover as payments for Duperval. Duperval later established a shell company, Telecom Consulting Services Corporation, with the help of Esquenazi, a co-owner of Terra. Duperval's sister, Marguerite Grandison, served as the president of Telecom and operated its checking account. Duperval's name did not appear on any of the corporate documents. After Grandison and Esquenazi signed a commission agreement between Telecom and Terra, Terra made seven wire transfers to Telecom that Terra described as "consulting fees." Terra transferred a total of $75,000 to Telecom. Cinergy also paid a total of $257,339.68 to Duperval through Telecom.

Duperval then transferred the money to himself. Crossover made three wire transfers, for a total of about $93,000, to Duperval's personal account. Grandison wrote 20 checks to Duperval that were drawn on the checking account of Telecom. Each check was for less than $10,000, and they totaled $63,577.64. Grandison also wrote checks to cash, and Duperval used other checks to purchase a house for

4

himself, pay his mortgage, contribute to college funds, and purchase other personal items.

### B. The Charges against Duperval and the Relevant Portions of His Trial.

A federal grand jury returned an indictment that charged Duperval with money laundering and conspiracy to commit money laundering. The indictment alleged that the money laundering involved the proceeds of violations of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 to -3.

Before Duperval's trial, the prosecution disclosed a declaration from Jean Max Bellerive, who was the Prime Minister and acting Minister of Justice and Public Safety of Haiti. Bellerive provided the declaration in response to an inquiry from an attorney who represented one of Duperval's co-conspirators. The declaration expressed that "Teleco has never been and until now is not a State enterprise."

The United States later helped Bellerive prepare a second declaration. The second declaration explained that Teleco was a part of the public administration of Haiti, that the first declaration was prepared for internal purposes, and that Bellerive did not know that the first request was related to a criminal trial in the United States.

A federal grand jury later returned a second superseding indictment that charged Duperval with two counts of conspiring to commit money laundering, 18

5

U.S.C. § 1956(h), and 19 counts of concealment of money laundering, *id.* § 1956(a)(1)(B)(i). This indictment also alleged that Duperval's financial transactions involved the proceeds of violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 to -3.

During jury selection, the district court asked the venire if any of the potential jurors had seen the "articles and media coverage . . . that mentioned Jean Bertrand Aristide, the former president of Haiti recently." Prospective jurors numbers seven and ten responded that they had seen articles. The district court asked each juror if "there [was] anything that [he] read in those articles, although [the court did] not think that those articles or stories are in any way related to this case, that would in any way influence [the juror's] ability to be fair and impartial in this case." Each prospective juror told the district court that he could be fair and impartial. When the district court asked the parties if any of the potential jurors should be questioned individually, Duperval's counsel asked to question prospective juror number seven about what media he had seen. The district court did not want to question him because it did not find that any of the media was prejudicial:

> The article, the stories that have come out have nothing to do with this case. They have to do with somebody, I don't even remember the details of it, because it was of no concern to me, but it really doesn't have anything to do with this case. I don't really see any need to go into it further.

6

The district court later allowed Duperval's counsel to question prospective juror number seven, and he was selected as a juror.

After jury selection, the district court instructed the jurors to avoid any media about a "federal criminal case, Haiti, telephone communications, anything like that." Before trial, the Miami Herald published an article entitled "Miami bribery probe zeroes in on Haiti's ex-leader Aristide." The article focused on the former president of Haiti, Jean-Bertrand Aristide, and on corruption in his administration. On the first day of trial, Duperval's counsel told the district court about the article, and the district court questioned the jurors as a group about whether they had seen the article. The district court questioned the jurors as a group because it "didn't see that [the article] was anything that would prejudice [a juror] if they were, in fact, still intending to comply with the instructions of the court." On each day of the trial, the district court reminded the jurors not to look at any media and to report to the district court any media that they saw.

On the second day of trial, the district court received a note from juror number one that stated she was "aware of Mr. Aristide's problems in Haiti, charges of corruption, etc., etc." The district court asked counsel for both parties how it should respond, and Duperval's counsel moved for the district court to question juror number one individually. The district court said that it would consider

7

interviewing the juror even though it "didn't get the impression that she read anything new."

On the evening of the third day of trial, the Miami Herald published articles about the murder of Patrick Joseph's father. Joseph was the General Director of Teleco before Duperval worked at Teleco, and the articles suggested that the murder may have been retaliation for Joseph's cooperation with the investigation into corruption. On the fourth day of trial, Duperval's counsel moved to question all of the jurors individually, but the district court denied the motion because it "might poison [the jury]." The district court explained that "each time that I have asked, I have been told by them that they haven't seen anything and haven't read anything, and . . . they do not seem to be shy about giving me notes telling me about things." Duperval's counsel also renewed his motion to question juror number one about her note, but the district court denied the motion. The district court explained that her note was based on only media that appeared before the second day of trial, which was not prejudicial, and it concluded that she was fair and impartial:

> [Her note] does not relate [that] charges of corruption have anything to do with this case. It was general corruption in the Haitian government and Mr. Aristide in particular, and I think there have been articles for years about that. So no, I'm not going to question her individually.
> . . .
> And I asked her on more than one occasion, "Is there anything that you have heard or is there any reason that you could not be a fair and

8

impartial juror?" And she has said, "No." There is no reason that she can't be a fair and impartial juror.

The district court concluded that juror number one was fair and impartial based on her responses to inquiries by the district court. At the beginning of voir dire, the district court asked the jurors to "please bring [anything you have heard about this case] to our attention . . . when we ask . . . [if] there [is] any reason that you think you might not be able to be a fair and impartial juror." The district court later asked the venire if any potential jurors had seen media about Haiti, and juror number one did not state that she had seen any such media. Later during voir dire, juror number one told the district court that she could be fair and impartial even though her son worked as a police officer. And, before trial began, the district court asked the jury if "there [was] anything that has happened . . . that would change your position when [the court] asked you if there is anything at all that would make it difficult or impossible for you to be fair and impartial in this case." Juror number one did not disclose anything to the district court that would impair her ability to be fair or impartial.

To establish that Duperval laundered the proceeds of illegal activity, the government introduced evidence that Duperval's co-conspirators violated the Foreign Corrupt Practices Act, *id.* § 78dd-2. The government presented the testimony of Louis Gary Lissade, the former Minister of Justice of Haiti and the

author of a book on public administration in Haiti. Lissade testified that Teleco was part of the public administration in Haiti.

Duperval testified in his own defense. Duperval admitted that he received money from Cinergy and Terra, but he asserted that the money was for doing a good job in the administration of the contracts. Duperval's counsel requested a jury instruction based on an exception to the Act for routine governmental action, *id.* § 78dd-2(b), but the district court denied this request.

A jury convicted Duperval on all counts. Based on a total offense level of 31 and a criminal history category of I, the presentence investigation report calculated Duperval's guideline range as 108 to 135 months. After it rejected Duperval's objections to the report, the district court sentenced Duperval to a term of 108 months of imprisonment and three years of supervised release.

## II. STANDARDS OF REVIEW

Several standards govern our review of this appeal. We review for abuse of discretion a decision not to question jurors individually about whether they saw publicity during trial. *United States v. Carrodeguas*, 747 F.2d 1390, 1395 (11th Cir. 1984).  We review *de novo* the sufficiency of evidence. *United States v. Demarest*, 570 F.3d 1232, 1239 (11th Cir. 2009). We "view[] the evidence in the light most favorable to the government and draw[] all reasonable inferences and credibility choices in favor of the jury's verdict." *Id.* (internal quotation marks and

10

citation omitted). "The relevant question . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). We review a refusal to give a requested jury instruction for abuse of discretion. *United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc). We also review *de novo* interpretations of the United States Sentencing Guidelines. *United States v. Johnson*, 375 F.3d 1300, 1301 (11th Cir. 2004). We review for clear error the findings of fact that underlie a determination that a sentencing enhancement applies. *United States v. Rendon*, 354 F.3d 1320, 1331 (11th Cir. 2003). And we review for an abuse of discretion the reasonableness of a sentence. *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (en banc). A sentence is substantively unreasonable only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (internal quotation marks omitted).

## III. DISCUSSION

This appeal presents five issues. First, we must decide whether the district court abused its discretion when it questioned the jurors as a group instead of individually about mid-trial publicity. Second, we must decide whether the

government presented sufficient evidence for the jury to find that Teleco was an instrumentality of Haiti. Third, we must decide whether the district court abused its discretion when it refused to instruct the jury on the exception for routine governmental action. Fourth, we must decide whether the government interfered with Duperval's right to call a favorable witness. Fifth, we must decide whether Duperval's sentence was procedurally or substantively unreasonable. We address each issue in turn.

### A. The District Court Did Not Abuse Its Discretion when It Questioned Jurors as a Group about Mid-Trial Publicity.

Duperval argues that the district court abused its discretion when it declined to interview jurors individually about whether they saw mid-trial publicity, but his argument fails. A district court has considerable discretion to determine how to respond to mid-trial publicity. *Gordon v. United States*, 438 F.2d 858, 873 (5th Cir. 1971). The district court did not abuse its discretion when it questioned jurors as a group instead of individually.

A district court should engage in a two-step inquiry to determine if it should individually question the jurors. *United States v. Herring*, 568 F.2d 1099, 1104–05 (5th Cir. 1978). The court should first determine if the material "raises serious questions of possible prejudice." *Id.* at 1104 (internal quotation marks omitted). If it does, the court should then "determine the likelihood that the damaging material has in fact reached the jury." *Id.* at 1105.

12

Although the district court did not individually question the jurors, it took actions to ensure the jurors were not exposed to publicity. Throughout the trial, the district court reminded the jurors not to look at any media and to report anything that they saw. After the various articles appeared in the Miami Herald, the district court questioned the jurors as a group instead of individually because individual questions "might poison [the jury]" and questions to the group would "not build[] it up to a big drama."

The district court did not abuse its discretion when it declined to question the jurors individually. The first article brought to the attention of the district court reported on President Aristide and the corruption in his administration. Aristide was not charged as a co-conspirator, and the jury heard undisputed testimony that other officials at Teleco had accepted bribes. The district court did not abuse its significant discretion when it determined that this article was not prejudicial. *Gordon*, 438 F.2d at 873. The district court also did not abuse its discretion when it determined that it was unlikely that any of the later articles reached the jurors. When it considers whether publicity likely reached the jurors, the district court should consider whether it has instructed the jury "to disregard . . . any external information on the case" and whether it has done so "on a regular basis." *Herring*, 568 F.2d at 1105. If a district court so instructs the jury, we presume that the jurors followed those instructions. *Carrodeguas*, 757 F.2d at 1395. Because the district

court repeatedly instructed the jury to disregard all media, the district court did not abuse its discretion when it determined that it was unlikely that the jurors had seen any of the articles.

The district court also did not abuse its discretion when it refused to question juror number one after she submitted a note about her awareness of corruption in Haiti. Although the preferable response would have been for the district court to question juror number one, the failure to question her was not reversible error. The district court determined that the juror's note on the second day of trial was based on only the media coverage that appeared before that day. The district court relied on the jurors' earlier responses that they had not seen any media coverage and their responses that they could be fair and impartial. The district court had already found that the earlier media coverage was not prejudicial, and it explained that the note "was talking about general corruption matters involving Mr. Aristide, not anything related to this case." As we have explained, the district court did not abuse its discretion when it concluded that the media coverage before the second day of trial was not prejudicial. *Gordon*, 438 F.2d at 873. Although the better course would have been to question juror number one individually, the district court did not abuse its discretion.

*B. There Was Sufficient Evidence for the Jury to Find that Teleco Was an Instrumentality of the Government of Haiti.*

Duperval argues that there was insufficient evidence for the jury to find that Teleco was an instrumentality of Haiti, but this argument fails. The government had to establish that Teleco was an instrumentality of Haiti because the scheme to launder money allegedly involved the proceeds of violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2. The Act prohibits officers of a domestic concern from making corrupt payments to a "foreign official." *Id.* § 78dd-2(a)(1). A "foreign official" includes "any officer or employee of a foreign government or any department, agency or instrumentality thereof." *Id.* § 78dd-2(h)(2)(A). The government presented ample evidence that Teleco was an instrumentality of Haiti.

Although the Act does not define "instrumentality," we recently explained that an instrumentality is "an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own." *United States v. Esquenazi*, 752 F.3d 912, 925 (11th Cir. 2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 293 (2014). In *Esquenazi*, we explained that "what constitutes control and what constitutes a function the government treats as its own are fact-bound questions," and we "provide[d] a list of some factors that may be relevant." *Id.* To determine if the government controls the entity, the fact-finder should consider the following several factors:

15

the foreign government's formal designation of that entity; whether the government has a majority interest in the entity; the government's ability to hire and fire the entity's principals; the extent to which the entity's profits, if any, go directly into the governmental fisc, and by the same token, the extent to which the government funds the entity if it fails to break even; and the length of time these indicia have existed.

*Id.* And to determine if the entity performs a function that the government treats as its own, the fact-finder should consider the following several factors:

whether the entity has a monopoly over the function it exists to carry out; whether the government subsidizes the costs associated with the entity providing services; whether the entity provides services to the public at large in the foreign country; and whether the public and the government of that foreign country generally perceive the entity to be performing a governmental function.

*Id.* at 926.

The government introduced sufficient evidence that Haiti controlled Teleco and treated that entity as its own. Our review of the sufficiency of the evidence is controlled by our recent decision in the appeal by Duperval's co-conspirators. *Id.* at 928–29. In *Esquenazi* and this appeal, the government introduced almost identical evidence about Teleco. That evidence included that the Central Bank of Haiti owned 97 percent of the shares of Teleco; the government had owned its interest since about 1971; the government appointed the board of directors and the general director of Teleco; the government granted Teleco a monopoly over telecommunication services; and the "government, officials, everyone consider[ed]

16

Teleco as a public administration." *Id.* As in *Esquenazi*, the jury could have reasonably found that Teleco was an instrumentality of Haiti. *Id.*

*C. The District Court Did Not Abuse Its Discretion when It Denied Duperval's Requested Jury Instruction on the Exception for Routine Governmental Action.*

Duperval argues that the district court erred when it refused his proffered jury instruction. Duperval requested that the district court instruct the jury on the exception to the Foreign Corrupt Practices Act for routine governmental action, 15 U.S.C. § 78dd-2(b). Duperval argues that he was entitled to an instruction on this defense because he introduced evidence that he was paid only for administering the contracts within their terms. But we conclude that the district court did not err when it refused Duperval's instruction.

A defendant has the right to have the jury instructed on a theory of defense only if "the proposed instruction presents a valid defense and [if] there has been some evidence adduced at trial relevant to that defense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995). When we review the refusal to give an instruction for abuse of discretion, we ask whether "the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case." *Svete*, 556 F.3d at 1161 (internal quotation marks omitted). But we need not engage in this inquiry if the defendant failed to introduce evidence relevant to the jury instruction.

17

The Act allows "any facilitating or expediting payment to a foreign official . . . the purpose of which is to expedite or to secure the performance of a routine governmental action." 15 U.S.C. § 78dd-2(b). Routine governmental action includes actions such as "obtaining permits . . . to do business[;] . . . processing governmental papers, such as visas and work orders; providing police protection, mail pick-up and delivery, or scheduling inspections[; and] . . . providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products." *Id.* § 78dd-2(h)(4)(A). Other actions are routine governmental action only if they are "actions of a similar nature" to those listed in the statute. *Id.* § 78dd-2(h)(4)(A)(v). But routine governmental action "does not include . . . any action taken by a foreign official involved in the decision-making process to encourage a decision to award new business to or continue business with a particular party." *Id.* § 78dd-2(h)(4)(B).

Duperval argues that he performed a routine governmental action when he administered the contracts, but he misunderstands this exception to the Act. As the Fifth Circuit explained, "[a] brief review of the types of routine governmental actions enumerated by Congress shows how limited Congress wanted to make the . . . exception[]." *United States v. Kay*, 359 F.3d 738, 750 (5th Cir. 2004). These actions are "largely non-discretionary, ministerial activities performed by mid- or low-level foreign functionaries," *id.* at 751, and the payments allowed under this

18

exception are "grease payments" to expedite the receipt of routine services, *id.* at 747.

The administration of a multi-million dollar telecommunication contract is not an "action[] of a similar nature" to the actions enumerated in the Act. 15 U.S.C. § 78dd-2(h)(4)(A)(v). Duperval was not a low-level employee who provided a routine service; he was a high ranking official who administered international contracts. And, when Terra and Cinergy paid Duperval, their "grease payment" was not to expedite the receipt of a routine service. Duperval was not "providing phone service" as the Act uses that term, *id.* § 78dd-2(h)(4)(A)(iv). "[P]hone service" appears along with "providing . . . power and water supply, loading and unloading cargo, or protecting perishable products." *Id.* The text of the statute refers to the government providing a service to a person or business, not to the government administering contracts with companies that provide telephone service.

Duperval's interpretation also is in tension with the section of the Act that describes what is not routine governmental action, *id.* § 78dd-2(h)(4)(B). A party cannot pay a decision-maker to continue a contract with the government, *id.*, but under Duperval's interpretation, a party could circumvent this limitation by "rewarding" the decision-maker for doing a good job in administering the current

contract. This interpretation, which would provide an end-run around the provisions of the Act, finds no support in the text of the Act.

Duperval presented evidence that he administered multi-million dollar contracts. He failed to prove that he performed a routine governmental action. Without any evidence to support his defense, Duperval was not entitled to his requested jury instruction. *Ruiz*, 59 F.3d at 1154.

## D. The Government Did Not Interfere with Duperval's Right to Call a Witness.

Duperval argues that the government violated his right to due process when it obtained Bellerive's second declaration. Duperval argues that we should review this issue *de novo*, but the government argues that we should review for plain error. Under either standard, no error occurred.

"Substantial Government interference with a defense witness' free and unhampered choice to testify violates due process." *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977). Examples of substantial interference include singling out a witness to assure the witness that he would be prosecuted and convicted of perjury, *Webb v. Texas*, 409 U.S. 95, 97–98, 93 S. Ct. 351, 353 (1972), prohibiting a codefendant from testifying in any manner if he accepts a plea agreement, *Henricksen*, 564 F.2d at 198, and threatening that the government will retaliate if the witness continues to testify, *United States v. Hammond*, 598 F.2d 1008, 1012–13 (5th Cir. 1979). *See also id.* at 1012 (collecting cases). The

20

defendant also "must establish . . . that the government's action worked to deprive him of a witness who could have testified on his behalf." *United States v. Garmany*, 762 F.2d 929, 937 (11th Cir. 1985).

The government did not violate Duperval's right to due process. Duperval offered no evidence that the government substantially interfered with Bellerive. The government sought only a clarification of Bellerive's first declaration. That the government "assisted Mr. Bellerive in preparing a second declaration" does not suggest that the government coerced or threatened Bellerive. The government of Haiti was cooperating with the investigation into corruption, so it is not suspicious that Bellerive clarified his statements after he realized the purpose of his declaration. Duperval also failed to prove that Bellerive would have testified at trial. Duperval has not alleged that he contacted Bellerive or that Bellerive would have testified but for the actions of the government.

*E. Duperval's Sentence Is Not Procedurally or Substantively Unreasonable.*

Duperval attacks his sentence on four grounds. First, he argues that the district court erred when it applied a two-level enhancement for a substantial part of the fraudulent scheme occurring outside the United States. Second, he argues that the district court erred when it applied a three-level enhancement for his role in the offense. Third, he argues that the district court erred when it applied a two-

21

level enhancement for obstruction of justice. Fourth, he argues that his sentence is substantively unreasonable.

1. A Substantial Part of the Fraudulent Scheme Was Committed Outside the United States.

Duperval argues that the district court erred when it applied a two-level enhancement for a substantial part of the fraudulent scheme occurring outside the United States, U.S. Sentencing Guidelines Manual § 2B1.1(b)(10)(B) (Nov. 2011). Duperval argues that the money laundering occurred only in the United States, but this conduct is not relevant for the enhancement. Instead, the wire fraud scheme is the relevant conduct, and a substantial part of that activity occurred outside of the United States.

The relevant conduct for this two-level enhancement was the wire fraud scheme. The Sentencing Guidelines provide that the base offense level for Duperval's conviction for money laundering is "[t]he offense level for *the underlying offense* from which the laundered funds were derived." *Id.* § 2S1.1(a)(1) (emphasis added). The reference to "another guideline refers to the offense level from the entire offense guideline (*i.e.*, the base offense level, specific offense characteristics, cross references, and special instructions)." *Id.* § 1B1.5(b). Duperval's presentence investigation report listed wire fraud as the underlying offense, 18 U.S.C. § 1343. The guideline for wire fraud provides for a two-level enhancement if "a substantial part of a fraudulent scheme was committed from

22

outside the United States." U.S.S.G. § 2B1.1(b)(10)(B). The relevant conduct for

this enhancement is the underlying offense, which, in this appeal, is wire fraud. *Id.*

§ 2S1.1(a)(1); *United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010).

The district court did not clearly err when it found that a substantial part of

the wire fraud scheme occurred outside the United States. The goal of the scheme

was to secure favors from Teleco, and Duperval worked for Teleco in Haiti, lived

in Haiti, and met with his co-conspirators in Haiti. This evidence supports the

finding by the district court.

### 2. Duperval Was a Manager of a Criminal Activity.

Duperval argues that the district court erred when it applied a three-level

enhancement for his role in the offense, U.S.S.G. § 3B1.1(b), but his argument

fails. A three-level enhancement applies if a defendant managed at least one

participant in a scheme that involved five participants. *Id.* The government

presented sufficient evidence of both elements.

The Guidelines provide a three-level enhancement "[i]f the defendant was a

manager . . . and the criminal activity involved five or more participants." *Id.* The

commentary to the Guidelines explains that the defendant is a manager if he

managed at least one other participant. *Id.* § 3B1.1 cmt. n.2; *see also United States*

*v. Njau*, 386 F.3d 1039, 1041 (11th Cir. 2004). The commentary also explains that

23

"[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1.

Duperval argues that Grandison was not a "willful criminal participant," but his argument fails. To prove that Grandison participated in the conspiracy, the government had to prove that she conspired "to conceal or disguise the nature, the location, the source, the ownership, or the control of . . . proceeds of [some form of] unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i), (h). Grandison was the president of Telecom and sole signator on its bank account, yet she was unable to answer a tax preparer's basic questions about the expenses of Telecom. Grandison also signed the fraudulent commission agreement between Terra and Telecom; received and deposited checks containing false memos; and disbursed funds to Duperval through withdrawals under $10,000. This evidence was sufficient to prove that Grandison knew that the money was the proceeds of unlawful activity.

Duperval also argues that the government did not prove that there were at least five participants, but this argument also fails. Duperval, Grandison, the two principals of Terra, and its in-house counsel participated in the scheme involving Terra. And Duperval, Grandison, and the three principals of Cinergy participated in the scheme involving Cinergy. Because there were at least five participants in each scheme and Duperval managed one of those participants, the district court did not err when it applied the three-level enhancement.

24

3. Duperval Obstructed Justice.

Duperval argues that the district court erred when it applied a two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1, but this argument fails. Duperval testified that Terra and Cinergy paid him over $400,000 as a token of their appreciation for how well he administered their contracts, but Duperval's testimony contradicted other evidence. Because the district court found that Duperval perjured himself, it did not err when it applied this two-level enhancement.

The Guidelines provide a two-level enhancement if "the defendant willfully obstructed . . . the administration of justice." *Id.* This enhancement applies when a defendant commits perjury. *Id.* cmt. n.4(B). Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (internal quotation marks omitted). "Although it is preferable that the district court make specific findings by identifying the materially false statements individually, it is sufficient if the court makes a general finding of obstruction encompassing all the factual predicates of perjury." *United States v. Diaz*, 190 F.3d 1247, 1256 (11th Cir. 1999).

The district court did not err when it applied the two level-enhancement. Duperval does not argue that his statements were the "result of confusion, mistake,

25

or faulty memory," *Singh*, 291 F.3d at 763. He instead asserts that his statements were "interpretive." But his statements directly contradicted other evidence about the payments. Antoine testified that the payments were a bribe for special treatment, and Duperval told an agent of the Internal Revenue Service that the payments were an incentive to extend the contracts with Terra and Cinergy. The district court found that Duperval's testimony was "ludicrous" and "perjurious." Although the district court did not use the term "willful," the record makes clear that it found that Duperval willfully perjured himself. This finding was sufficient to support the application of the two-level enhancement. *Diaz*, 190 F.3d at 1256.

### 4. Duperval's Sentence Is Substantively Reasonable.

Duperval argues that his sentence is substantively unreasonable, but this argument fails too. The district court considered the relevant factors before sentencing Duperval, 18 U.S.C. § 3553(a), and Duperval has not established that the court committed a clear error of judgment, *Irey*, 612 F.3d at 1189.

Duperval asserts that his sentence is unreasonable because defendants in similar cases received lower sentences, but his comparisons are inapt. When we consider disparity in sentencing, we first ask whether the defendant is similarly situated to the defendants to whom he compares himself. *See United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008). Duperval argues that his sentence is significantly greater than the average sentence for violations of the Foreign

26

Corrupt Practices Act. But Duperval was convicted of wire fraud and conspiracy to commit wire fraud, not violations of the Act. Duperval also argues that his sentence was significantly more severe than the sentences of two of his co-conspirators, Antoine and Joseph. But Duperval is not similarly situated to Antoine because Antoine cooperated with the government and pleaded guilty. *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). And Joseph had not been sentenced when the district court sentenced Duperval, so the district court could not have considered Joseph's sentence.

Duperval also asserts that his sentence is inconsistent with the relevant factors for sentencing, 18 U.S.C. § 3553(a), but we disagree. The district court mentioned that it considered the statutory factors, which include the seriousness of the offense, the deterrence of future similar crimes, and the need to provide just punishment, 18 U.S.C. § 3553(a)(2)(A)–(B). Duperval's sentence, at the low end of his guideline range, is reasonable.

## IV. CONCLUSION

We **AFFIRM** Duperval's convictions and sentence.

27

JORDAN, Circuit Judge, concurring.

For me, the claim regarding the district court's decision not to question Juror One about the note she submitted on the second day of trial is a close one. But the decision as to whether to interview a juror is a matter within the district court's discretion, *see United States v. Yonn,* 702 F.2d 1341, 1345 (11th Cir. 1983), and given the deference embodied in the abuse of discretion standard, *see In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994), I agree with the Court that there is no reversible error.

There were, however, good reasons for questioning Juror One about her note. That note, in full, read as follows: "I am aware of Mr. Aristide's problems in Haiti, charges of corruption, etc., etc." As far as I can make out from the record, Juror One did not indicate during voir dire that she had read any media reports concerning Mr. Aristide, the former president of Haiti. That understanding is confirmed by the colloquy between defense counsel and the district court after the receipt of the note. So the note Juror One provided to the district court likely meant one of two things. The first was that Juror One had remembered something she had not disclosed during voir dire. The second was that, between the time of jury selection and the beginning of trial, Juror One was exposed to information of one sort or another concerning "Mr. Aristide's problems in Haiti, charges of corruption, etc., etc." Both of these scenarios were potentially problematic. If

28

Juror One answered questions incorrectly during voir dire, the parties and the district court needed to know which ones so that they could figure out whether to replace Juror One with an alternate. And if Juror One was exposed to harmful information after jury selection, the parties and the district court needed to find out what that information was, and determine whether Juror One could put it aside in evaluating the evidence presented at trial.

Moreover, Juror One's note, after mentioning Mr. Aristide's "problems in Haiti" and "charges of corruption," ended with "etc., etc." Because "et cetera" generally means "similar things," and "so on," 1 Shorter Oxford English Dictionary 863 (5th ed. 2002), the better and safer route was to find out what Juror One meant by "etc., etc." *Cf. United States v. Caldwell,* 776 F.2d at 989, 998 (11th Cir. 1985) ("The more serious the potential jury contamination, especially where alleged extrinsic evidence is involved, the heavier the burden to investigate."). And speaking to Juror One would not have risked contaminating the other members of the jury, as the district court could have questioned her individually.

With these comments, I join the Court's opinion.

29