[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11680

_____

D.C. Docket No. 2:17-cr-14013-RLR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RICHARD MAURIVAL,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 7, 2021)

Before WILLIAM PRYOR, Chief Judge, and JORDAN and MARCUS, Circuit
Judges.

PER CURIAM:

Raising a number of issues, Richard Maurival appeals his convictions for filing his own false tax returns and aiding and assisting in the preparation of false tax returns of others. Following oral argument and review of the parties' briefs and the record, we affirm.[1]

## I

### A

From 2010 to 2015, Mr. Maurival—who is black and of Haitian descent—worked as a tax preparer in Florida and Georgia. He worked with two entities to file his clients' returns: BC Tax Services LLC, owned by his brother Beaunice Maurival; and JM Humanity Multi Services LLC, owned by Jean Rejuste. Both businesses had Electronic Filing Identification Numbers from the Internal Revenue Service, and Mr. Maurival had his own Preparer Tax Identification Number. In 2018, a grand jury charged Mr. Maurival with three counts of filing false individual tax returns in violation of 26 U.S.C. § 7206(1) and sixteen counts of willfully aiding and assisting in the preparation of false tax returns in violation of 26 U.S.C. § 7206(2).

At trial, the government called several of Mr. Maurival's clients as witnesses. Some of the clients were, like Mr. Maurival, black and of Haitian descent. Some of

---

[1] As we write for the parties, we assume their familiarity with the record and set out only what is necessary to explain our decision.

them were able to speak English with a creole accent (as was Mr. Maurival himself), but some needed an interpreter.

The clients testified about the false tax returns that Mr. Maurival had prepared. Those tax returns included unauthorized deductions or credits or impermissible claims of head of household filing status. The government called IRS Agent Stanley Lottman to explain the discrepancies in the filed tax returns given the evidence introduced at trial. Mr. Maurival took the stand in his defense and testified that the tax returns in question accurately reflected the information given to him by his clients.

During trial, one juror, G.D., informed the district court that she had heard racially and ethnically charged statements by two other jurors. G.D. then submitted a note describing the comments. According to the note, G.D. heard Juror A say, "I just don't like some of these people is [sic] hard to be impartial," and Juror B say, "Some of these witnesses don't even speak English, they shouldn't even be in this country." D.E. 102. Those statements were made on Friday, November 2, 2018, but G.D. did not notify the district court about them until the following Monday, when the jury was in deliberations. *See* D.E. 175 at 11.

Mr. Maurival requested that the district court conduct an interview to determine the identities of the jurors involved, question those jurors, and remove them and seat the alternates if they had in fact made those comments. The court

3

declined to conduct juror interviews at that time, and chose to give the jury the following instruction: "Ladies and gentlemen of the jury, let me remind you that your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against the defendant, the government, or any of the witnesses in this case." D.E. 109 at 17. That instruction was given on Monday, November 5, 2018, at 11:45 a.m.

Several hours after receiving this instruction, the jury found Mr. Maurival guilty of three counts of filing false individual tax returns and ten counts of aiding and assisting the preparation of false tax returns. The jury found him not guilty of six counts of aiding and assisting the preparation of false tax returns.

**B**

Mr. Maurival moved for a new trial based on a violation of his Sixth Amendment right to a fair and impartial jury. In his motion, he requested a new trial or in "the alternative, an evidentiary hearing at which juror interviews will be conducted[.]" D.E. 112 at 16. The district court granted the motion for a hearing, explaining that it would initially question only G.D., and noting that it could take further measures if there was evidence that the verdicts were racially motivated. *See* D.E. 140 at 14.

The district court held an evidentiary hearing to question G.D. under oath about the statements made by Jurors A and B. At the hearing, the court asked G.D.

4

a number of questions and permitted counsel for both sides to propose further questions.

G.D. explained that Juror A was referring to the IRS, while Juror B was referring to "foreign people." D.E. 175 at 6. G.D. said that, with respect to the statements made by Jurors A and B, the other jurors did not agree or acquiesce and "they let it go by." *Id.* at 11. With respect to what happened (or what she perceived) during deliberations, G.D. provided testimony that was, in some respects, uncertain and/or conflicting.

◆ G.D. said that she did not think that the curative instruction had its desired effect because, once deliberations began, Jurors A and B were "still in that thought process that they – the comments that they initially made," and she believed that "the mindset was still there, . . . there was a race issue." D.E. 175 at 6. *See also id.* ("So once we started deliberating, the issue of race came up, but it wasn't as strong as it was when they first made those comments[.]") But she also said that, once deliberations began on the Monday after the weekend break (the Monday the district court issued its curative instruction) "[n]o more comments about race were made[.]" *Id.* at 5.

◆ G.D. said she could not "be certain" that any juror had voted to convict Mr. Maurival on the basis of ethnicity or race because Jurors A and B had made the comments before deliberations began, "which made it a little difficult to be impartial

5

to the case." *Id.* at 5. But she also said that she had not voted to convict Mr. Maurival because of either ethnicity or race, and that it "was difficult to say what was on these jurors' minds once we started deliberating." *Id.* at 5, 7. *See also id.* at 8 ("If there were additional thoughts about race or discrimination maybe they kept them inside and I wouldn't be able to comment on that.").

◆ G.D. said that she based her verdicts on the evidence, but she could only speak for herself, as "[s]ome of the jurors [who] were looking at the evidence exclusively basically talked to the rest of the jurors" about the evidence. *Id.* at 12. But G.D. also said point-blank that, for the counts on which Mr. Maurival was found guilty, the jury went "over every single piece of evidence," and all of the jurors "agreed on that [the guilty verdicts]." *Id.* at 8. *See also id.* ("It took a little bit, as you know, but we did all agree on that."). When asked directly by the district court whether the guilty verdicts were "based on the evidence presented," G.D. answered "I believe it was. Yes." *Id.* And when asked a second time whether there was any indication in her mind "that any of the [eleven] other jurors' decision to convict was based on something other than the evidence," G.D. responded "I don't think so." *Id.* at 12.

At the end of G.D.'s testimony, the district court asked if there was "[a]nything else from the defense[.]" *Id.* Mr. Maurival, through counsel, wondered whether the jury had been hurried due to racial or ethnic animus, but said on the

6

record that the court "might have just questioned [G.D.] about that, and I guess she did answer that." *Id.*

At the conclusion of the evidentiary hearing, the district court orally denied Mr. Maurival's motion for a new trial, stating that it was "satisfied that the verdicts were based on the evidence." *Id.* The court later entered a written order denying the motion. It noted that the jury had deliberated for over ten hours over two days, found that "racial or ethnic prejudice was not a significant factor in the jury's verdict[s]," and specifically credited G.D.'s testimony that the verdicts were based on the evidence and not on bias. *See* D.E. 149 at 5.

The district court subsequently sentenced Mr. Maurival to a term of 84 months' imprisonment. This appeal followed.

## II

Mr. Maurival argues that his motion for a new trial should have been granted because of the statements by Jurors A and B. He contends that the district court violated his Sixth Amendment right to a fair and impartial jury by failing to cure the prejudice resulting from those statements by not conducting a sufficiently thorough inquiry on the matter of bias.

A new trial is warranted "if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review the denial of a motion for new trial for abuse of discretion. *See United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005). A court abuses

its discretion when it "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) (citations omitted).

Jurors are typically prohibited from testifying about deliberations after a verdict has been issued. *See* Fed. R. Evid. 606(b). But under *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017), jurors may testify about the jury's deliberations when there is "a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." Here, the district court found that the statements by Jurors A and B satisfied the *Peña-Rodriguez* threshold, and thus brought G.D. in to testify. In our view, Mr. Maurival has not shown reversible error.

First, the district court's decision to give a curative instruction when it learned about the alleged statements by Jurors A and B was not an abuse of discretion. Generally, "[a] curative instruction purges the taint of a prejudicial remark because 'a jury is presumed to follow jury instructions.'" *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (citation omitted). As G.D. testified, there were no comments about ethnicity or race once deliberations resumed on Monday, November 5. And the jury found Mr. Maurival not guilty on six of the charges. The lack of further improper comments and the mixed verdicts indicate that the curative instruction had its intended effect.

Second, the district court acted within its discretion in deciding to hear only from G.D. initially.  G.D. was the juror who reported the alleged statements by Jurors A and B, and the court told the parties that it could conduct a more searching inquiry if it heard from G.D. that the verdicts were based on racial or ethnic prejudice.  Under the circumstances, the court's chosen procedure was not an abuse of discretion.  *See United States v. Register*, 182 F.3d 820, 840 (11th Cir. 1999) ("When a juror's alleged improper conduct is brought to the court's attention, the court . . . enjoys substantial discretion in 'choosing the investigative procedure to be used in checking for juror misconduct[.]'") (citation omitted).

Third, "whether a juror is purposely not following the law is a finding of fact that we review for clear error," *United States v. Abbell*, 271 F.3d 1286, 1302–03 (11th Cir. 2001), and here the district court's finding that the guilty verdicts were not tainted by ethnic or racial prejudice was not clearly erroneous.  As an initial matter, G.D. explained that Juror A's statement ("I just don't like some of these people is [sic] hard to be impartial") was about the IRS, and was therefore not ethnically or racially based.  *See Peña-Rodriguez*, 137 S. Ct. at 869.

That leaves Juror B's statement: "Some of these witnesses don't even speak English, they shouldn't even be in this country."  We note that this statement could have been about the government witnesses (the clients) who needed interpreters, and not about Mr. Maurival, who spoke English.  But we need not base our decision on

that possibility. Although her testimony was not always perfectly consistent, G.D. said several times that the verdict, in her opinion, was based on the evidence. She also said that the jury had gone over the evidence for a long time before agreeing that Mr. Maurival was guilty on some of the charges. The district court was free, as the trier of fact, to find this testimony by G.D. to be probative and credible. Moreover, the jury returned not guilty verdicts on six of the charges, and the mixed result in part suggests that there was no "compelling prejudice." *United States v. LaSpesa*, 956 F.2d 1027, 1032 (11th Cir. 1992) (addressing severance claim).

Fourth, the district court found that Juror B's statement (together with Juror A's) "exhibit[ed] overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Peña-Rodriguez*, 137 S. Ct. at 869. Nobody has challenged this ruling. Thus, the district court faced the risk of racial bias, among the gravest of improper bases for a jury's decision. In our nation's criminal justice system, racial bias "implicates unique historical, constitutional, and institutional concerns." *Id.* at 868. It is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* Thus, courts should treat the possibility of racial bias in the jury room "with added precaution." *Id.* at 869. In order "to prevent a systemic loss of confidence in jury verdicts"—and in order to safeguard against the unacceptable possibility that criminal punishment be imposed on the basis of a defendant's race—

10

the Sixth Amendment requires that substantial allegations of racial bias in the jury room simply "must be addressed." *See id.*  Once a district court has undertaken to investigate whether a racially biased juror remark may have influenced the verdict, it must do so thoroughly; it must create a record sufficient to satisfy itself that the verdict was not tainted.  *Cf. United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985) ("The more serious the potential jury contamination . . . the heavier the burden to investigate.").

Determination of the precise scope of the proceedings necessary to create this record, of course, is committed to the district court's sound discretion.  Here, the district court acted within its discretion.  Although it might have been better practice to question Juror B following G.D.'s testimony, the district court's failure to do so did not constitute an abuse of discretion.  The Supreme Court has held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  The district court provided Mr. Maurival with that hearing, and allowed him (and the government) to propose questions for G.D.  The only question, then, concerns the scope of the hearing.

As noted, G.D. said several times that the verdict was, in her opinion, based on the evidence.  The district court, moreover, told the parties that it was going to question only G.D. initially but could conduct a more extensive inquiry if there was

11

evidence that the verdict was based on ethnic or racial prejudice. When the district court asked the defense at the end of G.D.'s testimony whether there was anything else, Mr. Maurival did not request that Juror B be questioned (he only considered proposing another question but decided the court had already asked it). Viewing the circumstances holistically, we do not see any reversible error.

In sum, we affirm the district court's denial of Mr. Maurival's motion for a new trial, and decline to order a further evidentiary hearing.

## III

Mr. Maurival argues that the district court erred in declining to give the jury a requested theory of defense instruction on tax preparers' responsibilities for the veracity of their clients' returns. His proposed jury instruction read as follows: "In your deliberations you may consider that the Defendant in his capacity as a tax preparer was under no legal duty to investigate the veracity or accuracy of the information presented to him by the tax payer clients."

Citing *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995), Mr. Maurival submits that he was entitled to the instruction if it had "any foundation" in the evidence. In response, the government submits that Mr. Maurival's proposed instruction was an incomplete and misleading statement of the law.

Reviewing for abuse of discretion, *see United States v. Duperval*, 777 F.3d 1324, 1331 (11th Cir. 2015), we conclude that the district court did not err. A

12

defendant's proposed jury instruction must, among other things, be a correct statement of the law, *see Ruiz*, 59 F.3d at 1154, and here Mr. Maurival's proffered instruction was substantially incomplete.

Mr. Maurival based his proposed instruction on Treasury Regulation § 1.6694-1, codified at 26 C.F.R. § 1.6694-1(e).  Although the language submitted by Mr. Maurival is found in § 1.6694-1(e) ("the tax return preparer generally may rely in good faith without verification upon information furnished by the taxpayer"), that language is qualified by what follows: "The tax return preparer, however, may not ignore the implications of information furnished [to him] or actually known by [him].  The tax return preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete." *Id.*

The government proposed that this additional language (and one other sentence from § 1.6694-1(e)) be added to Mr. Maurival's proposed instruction, but the defense objected.  Under the circumstances, Mr. Maurival's instruction was an incomplete (and therefore incorrect) statement of the law as set forth in § 1.6694-1(e), and the district court did not err in refusing to give it.

## IV

Mr. Maurival challenges the admission of evidence under Fed. R. Evid. 404(b) related to his preparation of the tax returns of four individuals not listed in the indictment.  The district court allowed these individuals to testify that Mr. Maurival

took his fees from their tax refunds using a Form 8888, which routed the fees directly into his business and personal accounts without their knowledge.

We normally review a district court's decision to admit evidence under Rule 404(b) for abuse of discretion. *See United States v. Ford*, 784 F.3d 1386, 1392 (11th Cir. 2015). But we do not see the testimony by these individuals as Rule 404(b) evidence. As noted earlier, Mr. Maurival was charged with filing his own false tax returns, and the government's theory was that he did not report income that he had received in the years in question. This unreported income, according to the government, included the sums received from these four individuals for the preparation of their returns. So the testimony by the four individuals was relevant and material, and not extrinsic, to the charges of filing false tax returns. Indeed, Mr. Maurival conceded that the testimony was relevant as to how gross income ended up in his accounts. *See* D.E. 169 at 4. We therefore conclude that the district court correctly admitted the testimony.

## V

We affirm Mr. Maurival's convictions.

**AFFIRMED.**

14